RB:CP:TK
F.#2009R01431

# M-11-499

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

       - against -

JAMES ROSEMOND,

     also known as "Jimmy
     Henchmen,"

          Defendant.

- - - - - - - - - - - - - - - - - -X

FILED UNDER SEAL

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF ARREST WARRANT

(T. 21, U.S.C., § 846)

EASTERN DISTRICT OF NEW YORK, SS:

      STEVEN J. MILLER, being duly sworn, deposes and says

that he is a Special Agent with the Drug Enforcement

Administration ("DEA"), duly appointed according to law and

acting as such.

      Upon information and belief, on or about and between

January 1, 2008 and May 9, 2011, within the Eastern District of

New York and elsewhere, the defendant JAMES ROSEMOND, also known

as "Jimmy Henchmen," together with others, did knowingly and

intentionally conspire to distribute and posses with the intent

to distribute five kilograms or more of a substance containing

cocaine, a Schedule II controlled substance, in violation of

Title 21 U.S.C. § 841(a)(1).

      (Title 21, United States Code, Section 846).

The source of your deponent's information and the
grounds for his belief are as follows:[1]

Background of the Investigation

     1.    Since at least 2009, the DEA and Internal Revenue
Service ("IRS") has been investigating a large-scale, bi-coastal
narcotics-trafficking organization that shipped cocaine from the
Los Angeles, California area to the New York City Metropolitan
area and that, in-turn, shipped proceeds of narcotics sales back
to Los Angeles. During the course of the investigation, DEA and
IRS agents have gathered extensive evidence demonstrating that
the defendant JAMES ROSEMOND was the principal leader of this
organization ("the ROSEMOND ORGANIZATION" or the "organization").
Agents also have compiled evidence revealing that the ROSEMOND
ORGANIZATION distributed hundreds kilograms of cocaine since 2008
and generated millions of dollars through its narcotics sales.

     2.    Evidence against ROSEMOND includes: (1) the
statements of numerous confidential sources and cooperating
witness who were members of the ROSEMOND ORGANIZATION, including
high-level members positioned just below ROSEMOND in the
organization's hierarchy; (2) consensually-recorded telephone
calls, emails and text messages between ROSEMOND and members of
his organization; (3) ROSEMOND ORGANIZATION parcels containing

---

[1] Because the purpose of this affidavit is merely to establish
probable cause to arrest, I have not set forth all of the facts
and circumstances of which I am aware.

wholesale amounts of cocaine and narcotics proceeds that were intercepted by law enforcement; (4) the analysis of financial records, accounting records, telephone records and emails; and (5) the execution of search warrants which have uncovered firearms belonging to members of the ROSEMOND ORGANIZATION.

### The ROSEMOND ORGANIZATION's Cocaine Business

3.   The ROSEMOND ORGANIZATION's core mission was the shipment of kilogram quantities of cocaine from California to New York, and the return of millions in drug proceeds from New York back to California. According to two high-ranking members of the ROSEMOND ORGANIZATION (CW-1 and CW-2)[2/], ROSEMOND headed a drug trafficking organization which relied on numerous cohorts on both coasts to ensure a near-continuous flow of cocaine and cash. Specifically, ROSEMOND regularly directed CW-1 to take possession of narcotics proceeds in New York and transport those proceeds to the West Coast. In addition, ROSEMOND regularly directed CW-2 to take possession and distribute the narcotics that arrived in New York. Both CW-1 and CW-2 have stated that ROSEMOND personally coordinated these cocaine and money shipments.

---

[2/] Following their arrest, both CW-1 and CW-2 confessed to participating in the ROSEMOND ORGANIZATION's narcotics-trafficking conspiracy and agreed to cooperate with the government in the hope of receiving a reduced sentence. While both CW-1 and CW-2 have extensive criminal records, their information has been corroborated by other sources of information, including but not limited to documentary evidence, seizures of drugs and money, other confidential sources and consensually-monitored communications.

4.    According to CW-1 and CW-2, the organization's
methods of shipment changed over time, in response to law
enforcement actions against the organization.  Prior to 2010, the
ROSEMOND ORGANIZATION used overnight mail carriers such as
Federal Express and UPS to transport narcotics and narcotics
proceeds.  CW-1 and CW-2 told agents that cocaine and cash was
packaged in vacuum-sealed wrapping and covered with mustard to
mask the smell of narcotics from drug-detecting dogs.  The
packages then were mailed under fictitious names and received by
"catchers," who were paid to take temporary possession of the
parcels.  ROSEMOND instituted this method of transporting
contraband to insulate the core members of the ROSEMOND
ORGANIZATION from prosecution in that it lowered the risk of
seizures by law enforcement and ensured that the core members of
the organization would not be caught receiving the packages.

5.    CW-1 and CW-2's information has been corroborated
by the seizures of narcotics and narcotics proceeds.  For
example, in 2009, a cousin of ROSEMOND's, who CW-1 and CW-2 have
identified as a member of the ROSEMOND ORGANIZATION, was arrested
after attempting to take possession of a parcel containing over
five kilograms of cocaine packaged in mustard.  That individual
has since pled guilty to participating in a drug-trafficking
conspiracy and received a sentence of 10 years' imprisonment.  In
addition, in December 2009, an individual identified by CW-1 and

CW-2 as one of the Los Angeles-based members of the organization was arrested after he took possession of three packages in Los Angeles that contained approximately $452,000 in cash that was packaged in vacuum-sealed wrapping and covered in mustard. Further, in the Summer of 2010, a search warrant was executed on a storage locker in the Los Angeles area that belonged to one of ROSEMOND's brothers. This locker's contents consisted of a suitcase containing mustard, vacuum sealing and other drug packing materials. Agents also had made numerous consensual recordings which captured ROSEMOND's brother arranging for the shipment of cocaine packages. He was subsequently arrested and has pled guilty to participating in a narcotics trafficking conspiracy.[3/]

6.    In the summer of 2010, agents in Los Angeles arrested one of the cocaine suppliers to the ROSEMOND ORGANIZATION, ("CW-3"), after CW-3 was observed attempting to mail parcels containing kilograms of cocaine packaged in vacuum-sealing and covered in mustard. CW-3 has pled guilty to participating in a narcotics trafficking conspiracy and agreed to cooperate with the government. Among other things, CW-3 stated that over a period of nearly two years, he provided over 100

---

[3/] In addition, in November 2009, another of ROSEMOND's brothers was found in possession of an automobile that contained a false compartment inside of which members of the California Highway Patrol discovered approximately $800,000 cash.

kilograms of cocaine to the ROSEMOND ORGANIZATION, some of which ROSEMOND personally ordered.

7.   Approximately two weeks after CW-3's arrest, ROSEMOND telephoned a long-time friend and associate of the ROSEMOND ORGANIZATION ("CW-4").  Unbeknownst to ROSEMOND, CW-4 had been arrested and pled guilty pursuant to a cooperation agreement for his participation in the ROSEMOND ORGANIZATION's cocaine conspiracy.  During the call, ROSEMOND warned CW-4 of the implications of CW-3's arrest.  Agents recorded this conversation and captured ROSEMOND warning CW-4 that CW-4's phone was likely tapped, that CW-4's arrest was imminent and that CW-4 should go into hiding:

ROSEMOND: Your phone has an extra fucking tape in your house, you understand what I'm telling you my nigger?  Like for real, for real, like move like you're on the run, move like you know these people are coming, bro . . . .

Nigger it could be a false alarm but I'm telling you right now my nigger, move like you're on the run.

During this conversation, ROSEMOND, believing that the government had obtained incriminating against him, stated that he no longer communicated using cellular telephones and that he was in the process of obtaining false identification in contemplation of going into hiding:

ROSEMOND: We can't have this conversation on no line. We can't have this conversation that is why I told you to come on let me talk to you, but I can't be on no line anymore.  I don't even

> have a phone with me, I'm going from phone
> booth to phone booth and I'm moving from one
> phone booth to another. . . . .
>
> Nigger stay low, move like you on the run right now
> cause that is what I'm doing nigger, trying to get
> some ID, some new paperwork all that shit right
> now.

8.    According to CW-1 and CW-2, following the arrest

of CW-3 and the other aforementioned seizures and arrests,

ROSEMOND altered the way the ROSEMOND ORGANIZATION transported

cocaine and cash.    Instead of using overnight delivery services,

ROSEMOND directed that his organization hide contraband in "road

cases" used to transport music equipment.    In light of ROSEMOND's

position as the CEO of Czar Entertainment ("Czar"), a music and

talent management company, ROSEMOND was able to disguise these

shipments as legitimate freight that was ostensibly needed by the

performance artists he managed.    The "road cases" method of

trafficking worked as follows.    After the road cases containing

cocaine arrived in music studios in New York City, members of the

ROSEMOND ORGANIZATION retrieved the road cases and distributed

the cocaine.    ROSEMOND's underlings collected the proceeds from

cocaine sales, packed the cash into the road cases and

transported them to music studios in Los Angeles.    There, the

money was used to purchase more cocaine.    The road cases were

often shipped under the alias "Peter Davis."

9.    CW-1 and CW-2 played integral parts in the "road

cases" scheme by retrieving the cocaine once it arrived at the

New York studios, distributing the cocaine to area dealers, and ensuring that the money needed to purchase additional narcotics was shipped to Los Angeles. According to CW-2, during 2010 and 2011, CW-2 personally participated in, and oversaw the shipment of hundreds of kilograms of cocaine using this method of shipment. Moreover, according to CW-1, during 2010 and 2011, CW-1 participated in and oversaw the shipment of millions of dollars in narcotics proceeds using this method of shipment. Both CW-1 and CW-2 stated that ROSEMOND arranged and coordinated these orders and shipments.

10. Shipping records obtained by the government revealed that the contraband-filled road cases were shipped under accounts belonging Czar (ROSEMOND's company) and to an individual who worked as the road manager for one of the performing-artists ROSEMOND managed (the "Road Manager"). Shipping records corroborate the statements of CW-1 and CW-2 in that they demonstrate that road cases in the name of "Peter Davis" and several other fictitious names were sent to the music studios referenced by CW-1 and CW-2, often on or around specific dates that CW-1 and CW-2 recalled delivering or retrieving cases.

11. The government seized one such road case. In the winter of 2010, acting on information provided by CW-1, DEA agents recovered approximately $790,000 of the ROSEMOND ORGANIZATION's drug proceeds, hidden inside a music case at a New

York City recording studio that had been rented under the name "Peter Davis." The currency was packaged in vacuum-sealed plastic in $100,000 bundles which included 30,463 $20 bills. Agents later learned that the Road Manager had arranged for the case to be transported from the studio in which it was discovered to Los Angeles, which is consistent with CW-1 and CW-2's description of trafficking methods employed by the ROSEMOND ORGANIZATION at that time.

12. CW-2 stated that, at ROSEMOND's direction, s/he participated in the distribution of the narcotics that generated the proceeds recovered from the seized road case. Further, CW-1 stated that, at ROSEMOND's direction, s/he participated in the packaging of the money that was recovered from that road case.

13. Following the seizure of the road case, in early 2011, the ROSEMOND ORGANIZATION again altered its methods. According to CW-2, ROSEMOND ordered that cocaine be transported inside hidden compartments of automobiles that were shipped from Los Angeles to New York. In addition, ROSEMOND became even more careful about evading law enforcement surveillance when speaking with other members of his organization.

14. When DEA agents arrested CW-2 in the spring of 2011, he was in possession of a Blackberry device that s/he used to communicate with ROSEMOND through a sophisticated email encryption system. According to CW-2, ROSEMOND would only give

orders relating to narcotics-trafficking via this encrypted email system.   Additionally, ROSEMOND provided key members of his organization with new Blackberry devices on an almost monthly basis.

15.   After CW-2's arrest, s/he agreed to let agents monitor ROSEMOND's encrypted emails to CW-2 in real time over a period of several days.   These communications revealed that ROSEMOND had arranged a transaction whereby an automobile containing a hidden compartment was going to be transported to a narcotics supplier who was to fill the hidden compartment with cocaine.   Further, the emails suggested that the vehicle ROSEMOND was to use to collect the drugs was not working.   For example, ROSEMOND stated in one email:

> This car thing is messing me up, I
> have a guy here ready to pass me 10
> and I'm can't move.   It's such a
> short run from here too.

Based on my experience, training and knowledge of this investigation, I believe that ROSEMOND was complaining that he could not arrange for the pickup of 10 kilograms of cocaine because the automobile that was to be used to hide the cocaine was not operating correctly.[4/]   Subsequent emails revealed

---

[4/] It seems likely that ROSEMOND meant that the hidden compart of the vehicle was not operating correctly, as opposed to the car's ability to operate generally.   In light of ROSEMOND's wealth and access to cash, it would not be difficult for a member of his organization to obtain a car at any time.

ROSEMOND's request for assistance in procuring a different vehicle.

### Recent Developments

16.  Following the seizure of the road case, in early 2011, ROSEMOND again altered his organization's methods. According to CW-2, ROSEMOND ordered that cocaine be transported inside traps, or hidden compartments of automobiles that were to be shipped from Los Angeles to New York. In addition, ROSEMOND became even more careful about evading law enforcement surveillance when speaking with other members of his organization.

17.  When DEA agents arrested CW-2 on May 4, 2011, s/he was in possession of a Blackberry device that s/he used to directly communicate with ROSEMOND through a sophisticated email encryption system. According to CW-2, ROSEMOND would only give orders relating to narcotics-trafficking via this encrypted email system. Additionally, ROSEMOND provided key members of his organization with new Blackberry devices on an almost monthly basis.

18.  After CW-2's arrest, s/he agreed to let agents monitor ROSEMOND's encrypted emails to CW-2 in real time over a period of approximately one week. These communications revealed that ROSEMOND had arranged a transaction whereby an automobile containing a hidden compartment was going to be transported to a

narcotics supplier who was to fill the hidden compartment with cocaine. Further, the emails suggested that the vehicle ROSEMOND was to use to collect the drugs was not working. For example, ROSEMOND stated in one email:

> This car thing is messing me up, I have a guy
> here ready to pass me 10 and I'm can't move.
> It's such a short run from here too.

Based on my experience, training and knowledge of this investigation, I believe that in this email ROSEMOND was complaining that he could not arrange for the pickup of 10 kilograms of cocaine because the automobile that was to be used to hide the cocaine was not operating correctly. Subsequent emails revealed ROSEMOND's request for assistance in procuring a different vehicle.

19. Further, on May 10, 2011, ROSEMOND sent the following email to CW- 2 concerning the vehicle:

> I got 150K in the South, do u wanna give me
> it here and send homie to grab in the South
> so I don't have to send car there then to
> other spot. Just a lot of movement when it
> can go straight whr it need to go.

Based on my experience, training and knowledge of this investigation, and after debriefing CW-2, I believe that in this email, ROSEMOND was asking CW-2 whether CW-2 could front the cash that was needed to purchase the drug load in California. This loan would have shortened the amount of time it would have taken

to procure the next drug shipment since CW-2 would have put the cash directly into the secret compartment of the vehicle being shipped to California. Further, if CW-2 could not help front the money, ROSEMOND would have been forced to divert the vehicle to the southern part of the United States where ROSEMOND had stored his cash before sending the vehicle on to California.

20. On May 11, 2011, just after midnight, ROSEMOND emailed CW-2, "hey, so one thing may come tomoro. Can u go to L.I to get it." Based on my experience, training and knowledge of this investigation, I believe that in this email ROSEMOND was asking CW-2 to take possession of a package containing one kilogram of cocaine from Long Island.

21. On the morning of May 11, 2011, ROSEMOND emailed CW-2, "get on stanby wit funds for one. 30.5." Based on my experience, training and knowledge of this investigation, and after debriefing CW-2, I believe that in this email ROSEMOND was telling CW-2 that CW-2 should be prepared to pickup one kilogram of cocaine and was naming the price for that quantity of narcotics, namely $30,500.

22. Through the consensually monitored emails, ROSEMOND and CW-2 agreed to meet on May 11, 2011 in Brooklyn, New York for purposes of CW-2 receiving the kilogram of cocaine from ROSEMOND. The meeting was surveilled by agents, and consensually recorded by CW-2. ROSEMOND arrived at the agreed-

upon location in a car with a known member of the ROSEMOND
ORGANIZATION ("the associate").  Upon their arrival at the
meeting spot, CW-2 entered ROSEMOND's vehicle.  The associate
exited the car, retrieved a package from the trunk of the car,
and got back inside the car.  The associate handed the package to
CW-2.  The package was found to contain one kilogram of a white,
powdery substance that field-tested positive for the presence of
cocaine.  The cocaine was packaged in a food-saver bag, similar
to packaging used in other seizures made to date.

### ROSEMOND's Substantial Drug Profits

23.   The DEA/IRS investigation has shown that ROSEMOND
earned substantial proceeds as a result of his leadership of the
organization.  To begin with, both CW-1 and CW-2 have stated that
they have handed to ROSEMOND hundreds of thousands of dollars in
cash, sometimes in increments that exceeded $100,000 at a time,
that represented the proceeds of narcotics sales.  These accounts
have been corroborated by various records, interviews and
documents that detail ROSEMOND's possession of large amounts of
unexplained cash.

24.   One of the main ways in which ROSEMOND was able to
spend the narcotics proceeds he earned was by converting cash
into Postal money orders that he used to pay his bills and meet
personal expenses.  ROSEMOND structured his purchases of these
money orders to avoid generating a report identifying him as the

purchaser.

25.   The United States Postal Service ("USPS") offers customers the option of purchasing money orders, with $1,000 being the maximum amount that can be negotiated through any one money order.   Pursuant to 31 U.S.C. § 5325, the USPS is prohibited from issuing money orders to an individual in any transaction amounting to $3,000 or more unless that individual furnishes appropriate identification.   Pursuant to 31 C.F.R. § 103.29, the USPS utilizes form 8105-A, which requests photographic identification and other identifying information from an individual transacting $3,000 or more in Postal money orders.   Title 31, United States Code, Section 5324(a)(3) prohibits the structuring of financial transactions designed to evade these reporting requirements.

26.   IRS agents have examined more than 1,200 Postal money orders issued between 2007 and 2010 that are linked to ROSEMOND.   The money orders were purchased mainly in post offices in Manhattan, Brooklyn, and Queens, New York and total over $1 million.   Based on my training and experience, I believe that ROSEMOND is responsible for the purchase and use of these money orders because they were sent largely on behalf of entities he controlled and made payable to persons and entities with whom he had a relationship or from whom he purchased goods or services. For example, ROSEMOND used these money orders to pay his rent,

his attorneys and his son's private school tuition, among many other things.

27.   The USPS records show that these money orders were purchased in a structured fashion.  Despite their volume and cumulative value of more than $1 million, there was not a single transaction involving one of these money orders that exceeded $3,000.  Thus, neither ROSEMOND nor any individual purchasing any of the approximately 1,200 Postal money orders on his behalf, was required to provide identification to a USPS employee.  However, on a significant number of occasions, purchases of money orders cumulatively exceeded well over $3,000 on a single date, but went unreported because they were purchased at different post offices or through two or more separate transactions at the same post office.  For example, there were at least 39 occasions in 2009 where the daily total of purchased money orders exceeded $3,000. Additionally, money orders totaling an amount exceeding $3,000 were often made payable to the same entity, even though they were purchased in separate transactions on the same day or on days close together.  Moreover, money orders were often purchased in amounts slightly less than $3,000.

28.   One example that is representative of ROSEMOND's efforts to structure large amounts of cash through the purchase of Postal money orders centers around payments to a Baltimore law firm (the "Law Firm").  From January 2007 through July 2010,

several hundred money orders with a total value of approximately $391,800 were made payable to the Law Firm. Attorneys from the Law Firm represented ROSEMOND in connection with a legal matter.

29. Despite their volume and value, no transaction involving money orders addressed to the Law Firm exceeded $3,000 and the purchases of these money orders were purposely structured to avoid the Postal reporting requirements. For example, during the three-month period of November 2007 through January 2008, approximately 32 money orders were made payable to the Law Firm, totaling approximately $27,000. On four occasions during this period, money orders were purchased in amounts that totaled $2,900, and on five occasions money orders were purchased in amounts that totaled $2,500. From January 7 to January 9, 2008 alone, 17 such money orders totaling $12,000 were purchased at six different post offices. Similarly, on March 17, 2009, five such money orders totaling $5,000 were purchased at three different post offices and in five separate transactions.

30. This pattern was clearly intentional. According to an employee who formerly worked for ROSEMOND at Czar, ROSEMOND would provide him/her with cash and instructions to purchase postal money orders while avoiding exceeding the $3,000 threshold at a single post office. As a result, the employee often traveled to multiple post office on the same day to make money order purchases that could have been accomplished in one visit to

a single post office.  While postal money orders offered ROSEMOND a convenient vehicle to convert his narcotics proceeds into a safer and cleaner form of currency, the evidence reveals that he went to great lengths to ensure that no law enforcement body would be alerted to the amount of cash he possessed.

31.  USPS records also show that hundreds of thousands of dollars in money orders purchased in a structured fashion have been deposited into Czar's bank account.  Since 2007, approximately $297,300 in such money orders have been deposited into Czar's account.  The payor listed on the money orders are almost all fictional entities.  For example, in June 2009, 12 different money orders made payable to Czar were purchased at three different post offices, over four transactions, totaling $10,000.  These money orders were issued by companies that are not registered in any state in the United States.  In addition, agents have attempted to visit several of the payor addresses listed on the face of the money orders and determined that those addresses did not exist.  Thus, ROSEMOND not only utilized structured money orders to pay for goods and services, but also to infuse Czar with cash.

32.  In addition, interviews with various contractors and vendors who performed work to renovate ROSEMOND's Brooklyn apartment reveal that ROSEMOND was in possession of large amounts of cash.  Thus far, agents have accounted for over $600,000 cash

that ROSEMOND paid to workers over a span of approximately two years. One contractor recounted that one of ROSEMOND's confidants handed him a knapsack full of cash as payment for the contractor's services. Further, over a two-week span in 2009, ROSEMOND paid $120,000 cash to two contractors.

33.   Further, agents have obtained receipts which reveal that over the past several years ROSEMOND spent thousands of dollars in cash on hotels, restaurants and other miscellaneous items. Also, in January 2010, ROSEMOND was captured on video at a bank in New York making a mortgage payment for his Brooklyn apartment in the amount of $12,000 cash.

### Witness Tampering and Obstruction of Justice

34.   To preserve his organization's drug-trafficking operation, ROSEMOND tampered with witnesses and obstructed justice to ensure that members of his organization did not cooperate with law enforcement. In the conversation with CW-4 recounted above, ROSEMOND succinctly summed up his fear of cooperation when he exhorted CW-4 not to reveal incriminating details to law enforcement:

ROSEMOND:          Most of the time the way these
                   cases are my nigger, as long as
                   niggers stay firm ain't nothing
                   gonna fucking happen.  You might
                   end up doing a little bit of time,
                   but it just gets worse when, just
                   don't fucking let nobody know
                   nothing man.

35.   During 2010 and 2011, ROSEMOND tampered with CW-3

following CW-3's arrest in Los Angeles. After CW-3 was transported to the Eastern District of New York, ROSEMOND ordered CW-1 to obtain a local defense attorney to represent CW-3 (the "Defense Attorney"). At their initial meeting, CW-1 provided the Defense Attorney with a piece of paper containing questions that ROSEMOND wanted the Defense Attorney to ask CW-3. Referring to ROSEMOND as "J," the first two questions stated: "When the feds came 2 see u, did they only ask about J. Who else specifically," and "What did they claim to know about J and others." The paper also contained a message that ROSEMOND wished the Defense Attorney to pass along to CW-3 which exhorted CW-3 not to cooperate:

> Lastly, stay firm, cuz the quantity is small. They gonna try to trick you to talk but don't. Also, K is not talking. So don't give them more than they already have.[5]

36. Several weeks later, ROSEMOND told CW-1 that he possessed information that CW-3 had attended a proffer meeting with the government and ordered CW-1 to visit the Defense Attorney at his office. ROSEMOND wanted CW-1 to let the Defense Attorney know that both ROSEMOND and CW-1 knew about CW-3's cooperation and that they were displeased that the Defense Attorney had not kept them abreast of the developments in CW-3's

---

[5] Based on my knowledge of the investigation, I believe that "K" referred to ROSEMOND's brother, who was arrested in or around the same time as CW-3.

case.  Moreover, ROSEMOND ordered CW-1 to try to convince the
Defense Attorney to withdraw from representing CW-3.  CW-1
promptly visited the Defense Attorney and relayed those messages
to him.  Following this encounter, the Defense Attorney feared
for his safety and that of CW-3.

    37.  Several days later, during a consensually recorded
telephone conversation, the Defense Attorney told CW-1 that he
would no longer represent CW-3, to which CW-1 responded
approvingly, "My man."

    38.  Additionally, after the arrest of another member
of the ROSEMOND ORGANIZATION in 2010, ROSEMOND learned that the
member had attended a proffer meeting with the government.
Following this revelation, ROSEMOND told CW-1 numerous times that
he was contemplating murdering this member.  However, CW-1 told
ROSEMOND that, in light of this investigation, it would be unwise
to commit an offense that could result in capital punishment.
According to CW-1, this reasoning helped persuade ROSEMOND to
drop the plan.

    39.  Agents also have spoken to numerous attorneys and
witnesses who revealed that ROSEMOND paid or offered to pay the
attorney-costs for at least five witnesses involved in this
investigation.[6]  Further, ROSEMOND has paid for a private

_____

[6] This, of course, is powerful evidence of the existence of the
ROSEMOND ORGANIZATION.  See United States v. Orgad, 132 F.Supp.2d
107, 125 (E.D.N.Y. 2001) (Gleeson, J.) ("[t]he Second Circuit has

investigator to visit several witness, including incarcerated witnesses, to determine if the witnesses were cooperating with the government.

40.  Based on my experience, training and knowledge of this investigation, I believe that ROSEMOND's numerous attempts to prevent co-conspirators from revealing information to the government demonstrates ROSEMOND's consciousness of guilt and his well-founded fear that the individuals he tampered with possessed information damaging to ROSEMOND and the ROSEMOND ORGANIZATION.

WHEREFORE, your deponent respectfully requests that the defendant JAMES ROSEMOND be dealt with according to law. Furthermore, I respectfully request that this affidavit be filed under seal.

_____
STEVEN J. MILLER
Special Agent, DEA

Sworn to before me this
11th day of May, 2011

_____
STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

held that the payment of legal fees for others-'benefactor payments'-or otherwise arranging for their representation is highly probative evidence of the existence and membership of criminal enterprises.")(internal citations and quotations omitted).