## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK
## BROOKLYN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | 1:11-Cr-00424-JG-4 |
| | * | |
| | * | Hon. John Gleeson |
| | * | |
| | * | |
| JAMES ROSEMOND, | * | **ORAL ARGUMENT REQUESTED** |
| | * | |
| Defendant. | * | |

## MOTION FOR A NEW TRIAL

COMES NOW the Defendant herein, JAMES ROSEMOND, by and through his undersigned counsel, and respectfully moves for a new trial. The Defendant's request is made pursuant to Rule 33 of the Federal Rules of Civil Procedure. The Defendant submits that the interests of justice require that the motion be granted. See United States v Smith, 331 U.S. 469, 91 L. Ed. 1610, 67 S. Ct. 1330 (1947). The Defendant recognizes that motions for new trial pursuant to Rule 33 are directed to the trial court's discretion, and that such are sparingly granted. United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992). However, Rule 33 does mandate the broadest possible inquiry into the nature of challenged proceedings. Id. On a motion for new trial, the court must review the challenged trial proceedings to ensure that the dictates of due process have been met. Id. In support of his motion, the Defendant puts forth the following claims:

1

**I**.    The Defendant's Right to be Represented by an Unconflicted Attorney was Violated and Thereby Deprived the Defendant of a Fair Trial.

**II**.    The Defendant's right to due process of law and a fair trial were violated due to juror misconduct.

**III**.    Trial counsel provided constitutionally ineffective assistance in opening the proverbial door to allow the government to introduce into evidence statements made by the Defendant during confidential proffer sessions. Following the opening by Shargel (Trial Transcript pps. 30-59). The prosecution moved to be able to use that admitted by defendant James Rosemond during proffer sessions due to Shargel opening that door during his opening statement. (Trial Transcript p. 59-60). Shargel admitted opening that door as argued by the prosecution. (Trial Transcript p. 60.)

**IV**.    The Defendant's right to due process of law and a fair trial were denied when the trial court failed to dismiss a juror who had a clear bias in favor of the prosecution. (Trial Transcript pps. 4-5 and 8-10).

**V**.    The testimony of Ross Kramer and Shargel could have impeached the testimony of the agents who testified of the purported admissions during the defendant's proffer sessions. Because Shargel did not pursue this, defendant James Rosemond suffered from ineffective assistance of counsel. (The trial transcript shows that neither Shargel nor Ross Kramer testified

2

as witnesses for the defense and the Transcript of the Curcio Hearing makes it obvious that both should have testified as witnesses for the defendant). This was further aggravated because defendant Rosemond specifically - by email -  demanded that, at least, Ross Kramer be a witness on the Curcio issues. Exhibit C.


**VI**.     The Acts of Shargel Which Allowed the Prosecution to Use the Defendants Admissions Made Under Proffer Agreements Caused the Violation of the Defendant's Fifth Amendment Right Against Self Incrimination**.** (Trial Transcript pps. 59-60.)


**VII**.     The use of information from the proffer sessions which information was provided pursuant to and as controlled by the proffer agreements violated the defendants rights under contract law. This because the defendant did not violate the terms and conditions of the proffer agreement which agreements were not ambiguous and were detrimentally relied upon by the defendant.   (Trial transcript pps. 2285 et seq.)


**VIII**.    Trial counsel provided constitutionally ineffective assistance in failing to object to the introduction of irrelevant testimony from Scott William Smith regarding a traffic stop effectuated against Mario Rosemond.  Counsel also provided ineffective assistance in his cross-examination of John P. Dash, III, in that defense counsel opened the proverbial door to permit the prosecution to inquiry of Dash as to links between Mario Rosemond and the  Defendant. (Trial Transcript pps. 1091-98).

**IX**.    It was error for the court to permit the prosecution to elicit testimony from a federal agent which testimony was that the defense attorney had provided to the prosecution those eight (8) names of those the defense attorney represented to be drug suppliers of the defendant. (Trial transcript pps. 2285 et seq.)

## CONCLUSION

For the foregoing  reasons, as well as the argument put forth in the attached memorandum, the Defendant asks this court to grant his motion for a new trial.

Dated: Mineola, New York
      July 11, 2013

Respectfully submitted,

by:    /s/_____
      David A. Bythewood, Esq. (DB-2814)
      Attorney for the Defendant
      85 Willis Avenue, Suite J
      Mineola, New York 11501
      (516) 741-0066
      Dabytheesq@aol.com

## CERTIFICATE OF SERVICE

I certify that on the date reported below I electronically filed the foregoing motion and attached memorandum with the United States District Court for the Eastern District of New York by using the CM/ECF system. I certify that the following attorney for the opposing party, the United States, is registered an ECF Filer and will be served by the CM/ECF system: Carolyn Pokorney, carolyn.pokorny@usdoj.gov; Todd Kaminsky, todd.kaminsky@usdoj.gov; Una A. Dean, una.dean@usdoj.gov; Lan Hguyen, lan.nguyen@usdoj.gov; and Soumya Dayananda, soumya.dayananda@usdoj.gov.

July 12, 2013

/s/_____
David A. Bythewood, Esq. (DB-2814)
Attorney for the Defendant
85 Willis Avenue, Suite J
Mineola, New York 11501
(516) 741-0066
Dabytheesq@aol.com

## STATEMENT OF FACTS

An biased juror, juror number 12, was allowed by the court to remain a juror and denied the defendant's motion to remove her. (Trial Transcript pps. 8-10).

The attorney for the defendant, Shargel, in the above referenced matter, without the protection afforded by a Proffer Agreement, provided the prosecution with the names of eight (8) individuals and then failed to object when the prosecution, when eliciting those names from federal agent Steven Miller, allowed Miller to testify that those names were provided by him. (Trial transcript pps. 2285 et seq.) Those eight individuals whose names were the eight (8) names and identities were provided, by Shargel to the prosecution, were purportedly eight (8) individuals who sold purported large quantities of cocaine to defendant Rosemond and was part of that which was essential for the case against him as being the leader of a criminal drug enterprise. That providing by Shargel of those eight (8) names and other of his acts gave to the prosecution the evidence they needed to convict the defendant and was among the acts of Shargel that caused the defendant to suffer from the ineffective assistance of his counsel. It also bolstered the testimony of Government Witnesses as it constituted Shargel Vouching for their credibility as well as the credibility for the prosecution's case and also made Shargel a witness for the Prosecution, and conflicted him.

After Shargel had provided the eight (8) names to the prosecution, under his representation and direction, defendant James Rosemond participated in eight (8) proffer

sessions (Trial Transcript pps. 2285 and 2286) each of which proffer sessions was governed by the protections provided by the language of a written Proffer Agreement. An example of such Proffer Agreement is annexed hereto and made a part hereof as Exhibit A. Each said Proffer Agreement guaranteed confidentiality to the defendant and therein referred to the defendant as "Client". In the body of each said Proffer Agreement there was clear and specific protective language that induced James Rosemond - here detrimentally - to make certain disclosures to the prosecution which language stated: "In any prosecution brought against Client by the Office, except a prosecution for false statements, obstruction of justice or perjury with respect to acts committed or statements made at or after the meeting, the Office will not offer in evidence any statement made by Client at the meeting (A) in its case in chief or (B) at sentencing." See: Exhibit A. It is noted here that each Proffer Agreement was an arms length contract that was never breached by defendant James Rosemond.

At the opening of the trial of defendant James Rosemond. Thereafter, Shargel made certain statements in his Opening Statement - which Opening Statement has the purpose of telling the jury what the evidence will show - that allowed the prosecution to successfully argue that due to Shargel's statements the confidentiality contractually guaranteed to defendant James Rosemond had been lost and, consequently, the prosecution could and would use those disclosures made by defendant James Rosemond at the proffer sessions in its case in chief against him. (Trial transcript pps. 56 and 188). Shargel, on the record, sated that he had intentionally committed his acts that allowed the prosecution to use the protected disclosures by defendant James Rosemond against him. (Trial transcript pps. 60, 61 and 182). The prosecution

7

used this damning evidence and made specific reference to it as the admissions of defendant James Rosemond that was all that was needed to convict him. (Trial transcript pps. 2285 et seq.) When elicited from federal agents and offered into evidence Shargel never objected. Id. And, as a consequence, James Rosemond was convicted.

Prior to the prosecution using the disclosures of defendant James Rosemond against him in its case in chief, which disclosures he had provided pursuant to Proffer Agreements, the prosecution sent a letter to Judge Gleeson, dated April 9, 2012, in which Judge Gleeson was advised of certain proffer protected disclosures that the prosecution intended to use at trial. Thereafter Shargel, who had attended those proffer sessions, responded with his own letter dated April 11, 2012, to Judge Gleeson. In that letter he challenged what the prosecution represented as that which had been disclosed at the proffer sessions by defendant James Rosemond and referenced his associate, Ross Kramer, as having a different recollection of the content of the disclosures and that he intended to call Kramer as a witness at trial. A copy of that Shargel letter is attached hereto as Exhibit B. The issues raised by Shargel in that letter were serious as the letter was asserting that the prosecution was planning use contrived evidence against defendant James Rosemond. Clearly Shargel had attended all of the proffer sessions and had placed his signature of the Proffer Agreements as the attorney for James Rosemond. In light of the letter from Shargel in which Shargel disputed the accuracy of what the government claimed was purportedly said by defendant James Rosemond during his proffer sessions, Judge Gleeson ordered a Curcio hearing which was convened on April 12, 2012. (Cover page of transcript of Curcio hearing). During the Curcio hearing it was established that Shargel attended all of the

8

proffer sessions nut that Shargel's associate, Kramer, did not attend all of the proffer sessions. (Transcript of Curcio hearing, p. 3.). Shargel, during the Curcio hearing advised the court that he would decide prior to the trial whether or not he would call Kramer as a witness. (Transcript of Curcio hearing p. 4) There was no mention of Shargel being called a s a witness. Shargel went on to tell the court that it would be decided whether or not Kramer would be called as a witness by May 5, 2012.  (Transcript of Curcio hearing p. 5). The court advised Shargel that he would have to decide whether or not Kramer was to be called as a witness prior to the start of the trial. (Transcript of Curcio hearing p. 6). Shargel, during that hearing noted that a protective order that precluded any dissemination of the proffer material but between the attorneys. (Transcript of Curcio hearing p. 9). The prosecution then raised the issue of Shargel's recollection of the disclosures made by defendant James Rosemond during the proffer sessions. (Transcript of Curcio hearing p. 14). The court recognized this as a good point and noted that Shargel's recollection might differ from that of Kramer. Id.  Shargel said that his recollection was no different than Kramer's. (Transcript of Curcio hearing p. 15). But, while Shargel attended all of the proffer sessions, Kramer did not attend them all. (Transcript of Curcio hearing p. 3). Apparently with this in mind the court said to Shargel: "... if Kramer and the agent remembered a critical fact in one way that's unfavorable to your client and you remembered it in another way that's favorable to your client, there could be a problem at trial. He might need you as a witness instead of Ross Kramer and you would be unavailable. (Transcript of Curcio hearing p. 15, lines 12-17). No waiver was secured from defendant James Rosemond during the Curcio Hearing, (Transcript of Curcio hearing), or thereafter. *It should be noted that throughout the Curcio hearing the court was concerned due to a lack of a waiver by the defendant.*

9

The trial commenced and even though defendant James Rosemond emailed Shargel and Ross Kramer that he wanted Ross Kramer to testify. Exhibit C. Defendant James Rosemond's desire to have Ross Kramer testify was ignored. Shargel never called Ross Kramer as a witness. And, and since he had, without question, attended all of the proffer sessions was, at that time, a witness who was needed to testify for on behalf of the defendant and should have removed himself as the attorney for James Rosemond. He failed to do so notwithstanding his advocate/witness status. Thereafter, Shargel was in conflict and in violation of the disciplinary rules for New York State attorneys. In addition, this caused there to be a conflict of interest mandating Shargel removing himself as counsel for defendant James Rosemond. Kramer, in fact, participated in the trail as a defense attorney for the defendant. (Trial transcript p. 2465 lines 6 & 7). This failure to call Ross Kramer was a witness was an act of defiance of the direction of the defendant who specifically directed that Ross Kramer be called as a witness. Exhibit C, which is a true copy of the email of the defendant to both Shargel and Ross Kramer instructing that Kramer be called as a witness. The testimony of Ross Kramer and Shargel could have impeached the testimony of the government agents who provided said testimony of the purported admissions made by the defendant during his proffer sessions.

At the commencement of the trial, in the jury selection phase, juror number 12 made improper contact with the prosecution notwithstanding the court's admonition against said contact. In fact, it was reported that juror number 12, at around the same time if that contact, made a hand gesture to the prosecution of thumbs up. Juror number 12's acts were seen and reported and when she was questioned her answers were evasive. She could not recall the

10

substance of what she said, perhaps conveniently, due to an apparent desire to be a prejudiced juror. This is supported by the fact that the juror made contact with the prosecution directly and not with a more appropriate person such as a court reporter or the judge. That this juror elected to make contact with the prosecution causes a presumption that she was biased in favor of the prosecution. It was an error for the court to not immediately remove that juror. There was no way of telling what this juror said or did while serving and how much damage it caused to defendant James Rosemond.

During the trial, without laying any foundation whatsoever and without any objection from Shargel, the prosecution introduced testimony from a California policeman named Smith (Trial transcript pps. 970 et seq.). Smith testified to being called to the scene by another California policeman who had stopped the brother of defendant James Rosemond. His elicited testimony that followed was of the drug detection dog showing a reactions that was believed by those California policemen to be a reaction to drugs. But, no drugs were found. Instead, when they searched that automobile they found, in the trunk, what Smith described as a duffel bag that contained over $800,000.00 in cash and a secret compartment. At no time was there any nexus that connected this automobile, the more than $800,000.00 or the secret compartment to defendant James Rosemond. In all the testimony elicited had no probative value whatsoever but was extremely prejudicial and damaging to the defendant.

Also, during the course of the trial the prosecution introduced evidence of not only the signature of defendant James Rosemond on the proffer agreements, but also that the signature of

his attorney was likewise thereon. (Trial Transcript pps. 1334 - 1335). At no time did Shargel object to this. Id.

Throughout the summation of the prosecution it made specific reference to the proffer sessions of the defendant and that during those proffer sessions the defendant admitted to committing every crime that he was charged with  (Trial transcript pps. 2486, lines 7-25; 2487 lines 1-25; 2488 lines 1-12; 2489 lines 23-25; 2490 lines 1-11; 2491 lines 13-19; 2506 lines 13-25; 2507 lines 17-25; 2508 lines 1-11; 2512, lines 1-15; 2522 lines 3-25; 2523 line 1; 2524 lines 7-25; 2525 lines 1-6; and finally on page 2530 lines 14-16. Thereafter, on rebuttal, the prosecution continued its specific references to the admissions of the defendant during the proffer sessions and that he admitted thereat to all of the crimes he was charged with.(Trial transcript pps. 2650 lines 22-25; 2651 lines 1-13; 2667 lines 9-25; 2668, lines 1-19; 2669 lines 20-25; and 2670 lines 1-8. Also during the trial the prosecution made strong references to prove that the entertainment business of defendant James Rosemond were all failing and in debt. (Trial transcript pps. 2549 lines 7-25 2550 lines 1-5 and 2531 line 3. In addition, Shargel failed to call the witnesses who had actual knowledge of the businesses of defendant James Rosemond but, for reasons known only to Shargel failed to call them and, this notwithstanding assuring the defendant that they would be called. Exhibits F and G.

At the end of the trial the court never instructed the jury on the summations by telling the jury that the summations were not evidence. Instead the court said: "All right. You've got all the evidence. Now we are going to proceed with what we call summations... You've got all the

evidence now, the testimony in the case, the exhibits I received into evidence and the stipulations, the facts stipulated to. That's the evidence on which you base your verdict. What you will hear no won't add to that. It can't add to that. But, it does not mean that it is not important..." (Trial Transcript pps. 2474 lines 5-15.) In addition, at the time of these final instructions, the court failed to charge the jury that the statements of the lawyers was not evidence.

Following the trial, when interviewed by a writer, <u>Exhibit</u> D, one of the jurors, a Mr. Olatunji, who sat as a juror at the trial of James Rosemond, disclosed to that writer that the jurors violated the court's direction and utilized unreliable information from sources other than the evidence presented at trial as the basis for their verdict of guilty. Also, following the trial, two of the women jurors who sat on the trial were overheard having a conversation, <u>Exhibit</u> E, that corroborated this, that there was, in fact, jury misconduct.

## MEMORANDUM OF LAW IN SUPPORT OF
## THE MOTION FOR A NEW TRIAL

As a matter of introduction, the Defendant respectfully submits that the events which transpired in the instant case constitute a denial of the Petitioner's rights to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution, to a fair trial as guaranteed by the Sixth Amendment to the United States Constitution, and to due process of law as guaranteed by the Fifth Amendment to the United States Constitution. These errors were not merely procedural, but substantially infringed upon the Petitioner's constitutional rights.

## LAW AND ARGUMENT

**I.     The Defendant's Right to be Represented by an Unconflicted Attorney was Violated and Thereby Deprived the Defendant of a fair trial.**

There were several events and a number of indisputable facts, all of which were \ documented which show that James Rosemond's defense attorney, Gerald Shargel, and his associate, Ross Kramer, were conflicted. As a consequence defendant James Rosemond was denied his right to a fait trial and should be granted a new trial.

When judging whether defense counsel was ineffective due to conflict of interest, the Strickland is not the test to be used regarding ineffective assistance of counsel. Where there is an actual conflict the court must utilize the test laid out in Cuyler v. Sullivan, 446 U.S. 335, 64 L.Ed.2d 333, 100 S.Ct. 1708, [1980]. Under the Cuyler standard, the moving defendant need only show an actual conflict of interest that adversely affected the attorney's performance. Id. Prejudice need not be shown. Id. See: Tueros v. Greiner, 343 F.3d 587 [2nd Cir. 2003].

14

**A)** As is set forth in the facts above, it came to this court's attention that a <u>Curcio</u> hearing (<u>Curcio v. United States</u>, 680 F.2d 881 [2nd Cir. 1983]), was required. At the <u>Curcio</u> hearing it was established that both of defendant James Rosemond's defense attorneys, Gerald Shargel and Ross Kramer, because  they were the sole possessors of actual knowledge that, if they testified, could both challenge the testimony of the government agents and could also possibly impeach them. See: <u>United States v. Kliti</u>, 156 F.3d 150 [2nd Cir. 1998].

This is all material and of critical importance because that evidence in question consisted of what defendant James Rosemond admitted to, if anything, during the eight (8) proffer sessions he attended. That which would be and was testified to by those government agents were purported admissions made by defendant James Rosemond at the proffer sessions which admitted everything he was charged with and which was enough, if admitted and unchallenged to convict him of every count he was charged with in the indictment.

Once it was apparent that defense attorneys Gerald Shargel and Ross Kramer were the sole known witnesses who could challenge the testimony and possibly impeach the government witnesses those attorneys were no longer qualified to represent James Rosemond at his trial because their actual knowledge of facts that could both challenge the testimony of government witnesses as well as possibly impeach them disqualified them. However, neither acted as a witness for defendant James Rosemond, neither was disqualified and both continued to represent defendant James Rosemond to the conclusion of his trial which resulted in his conviction.

"If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his

client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation..." DR 5-102. See also, United States v. Orgad, 132 F. Supp.2d 107, 121 & n.7 [E.D.N.Y. 2001]. See, also, United States v. Tatum, 943 F2d 390 [4th Cir. 1991] *and* United States v. Locascio, 6 F3d 924, 932-933 [2nd Cir. 1993].

The issue of waiver does not exist for the defendant never waived his rights which waiver was discussed during the Curcio hearing but which waiver was never made by defendant James Rosemond. And, waiver cannot be inferred because it must be knowing and intelligent. Curcio v. United States, 680 F.2d 881, 888 [2nd Cir. 1983].


**B)**. Gerald Shargel was also conflicted with the defendant because he was due a "constructive witness" for the prosecution. This occurred when, prior to and without the protection of a proffer agreement, he provided the prosecution with evidence to be used against the defendant in the form of the names of eight (8) individuals who purportedly supplied cocaine to the defendant, which prosecution evidence was critical to its prosecution of defendant James Rosemond and, due to its source, improperly bolstered the prosecution's case. This was all further aggravated and solidified Shargel as being a constructive witness for the prosecution when he failed to object to the prosecution introducing that evidence, of the eight (8) names along with the source of those eight names being him when that evidence was elicited from and through federal agent Steven Miller, during agent Miller's direct testimony. Agent Miller specifically testified that the eight (8) names were provided by the defendant's attorney. This is all very clear on page 2286 of the trial transcript. See: U.S. v. Stephens, 365 F3d 967, 976 [11th Circuit]. Shargel, as a constructive witness for the prosecution, was in direct conflict with the

interest with his client, defendant James Rosemond. It could never be in the interest of defendant James Rosemond for his defense attorney to be a constructive witness for the prosecution. See, also, United States v. Bright, 2013 U.S. App. LEXIS 13179 [2nd Cir. 2013].

**C**). During the trial of James Rosemond, when Shargel refused to call the witness that Defendant James Rosemond wanted called, Shargel's interests and the interests of defendant James Rosemond diverged. And, "[A]n attorney has an actual, as opposed to potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests 'diverge with respect to a material fact or legal issue or to a course of action.'" Winkler v. Keane, 7 F.3d. 304, 307 [2nd Cir. 1993] *quoting* Cuyler v. Sullivan, 446 U.S. at 356 n. 3, 100 S.Ct. At 1722 n. 3., *and cited see e.g.* United States v. McLain, 823 F.2d 1457, 1463-64 [7th Cir. 1986].

**D**). Shargel did not object to and was also in conflict when the prosecution introduced into evidence that he was present at the proffer sessions and that he had signed his name to all of the proffer agreements. Then, immediately, Shargel should have made himself available to testify on behalf of defendant James Rosemond in order to "... dispel any impression left that upon the jury that he had been responsible..." for defendant James Rosemond's admissions that were being put into evidence... Finally, whether or not he actually testified, his firsthand involvement ... would cause any argument to the jury that about that (the admissions) to be viewed as a statement of a witness as well as of an advocate. Our prior decisions indicate that such circumstances constitute a disqualifying conflict under Disciplinary Rule 5-102." United

17

States v. Iorizzo, 786 F.2d 52, 57 [2nd Cir. 1986] *citing* United States v. McKeon, 738 F.2d 26, 34-35 [2nd Cir. 1984].

**E)**. It is believed that Shargel did not remove himself and his associate as the defense attorneys for defendant James Rosemond, when it was obvious that both Shargel and Ross Kramer were necessary defense witnesses, because that would have required Shargel to refund to defendant James Rosemond the substantial attorney trial; fees he had been paid. Instead of becoming witnesses for the defense Shargel elected to keep himself and Ross Kramer as defense witnesses and thereby deprived the defendant of a valid line of defense. United States v. Levy, 25 F.3d 146 [2nd Cir. 1994]. And, this decision and course of action, as well as others, was detrimental to the defendants interest. United States v. Schwartz, 975 F2d 1043. And, since defendant James Rosemond instructed Shargel to call Ross Kramer as a witness as well as others, as soon as Shargel disregarded these instructions of defendant James Rosemond he was in conflict. Gomez-Diaz v. United States, 433 F.3d 788 [11th Cir. 2006]. This believed act of Shargel was that of advancing his own interests over that of his client, defendant James Rosemond. Stoia v. United States, 22 F.3d 766, 771 [6th Cir. 1994].

**II.    The Defendant's Rights to Due Process of Law and a Fair Trial Were Violated When Members of the Jury Considered Evidence from Outside of the Record.**

Here, by the affidavits of Jarrod Whittaker (Exhibit D) and Tamika Wooly (Exhibit E), a prima facie case of juror bias and misconduct has been presented requiring a hearing on juror bias and misconduct. If, thereby, juror bias and/or misconduct is found, a new trial must be ordered. United States v. Vitale, 459 F.3d 190, 197 [2nd Circuit 2006]

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be deprived of life, liberty, or property, without due process of law." U.S. Const., Amend. V. In evaluating due process claims, this court inquires whether the practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 [1934]. As stated by Justice Frankfurter, due process

> embodies a system of rights based on moral principles so deeply imbedded in the traditions and feelings of our people as to be deemed fundamental to a civilized society as conceived by our whole history. Due process is that which comports with the deepest notions of what is fair and right and just.

Solesbee v. Balkcom, 339 U.S. 9, 16, 70 S. Ct. 457, 461, 94 L. Ed. 604 [1950].

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right to trial by an impartial jury. The right to a trial by an impartial jury lies at the very heart of due process. Irvin v. Dowd, 366 U.S. 717, 721-722, 81 S.Ct. 1639, 1641-1642, 6 L.Ed.2d 751 [1961]. "[O]ur common-law heritage, our Constitution, and our experience in applying that Constitution have committed us irrevocably to the position that the criminal trial has one well-defined purpose--to provide a fair and reliable determination of guilt." Estes v. Texas, 381 U.S. 532, 565, 85 S.Ct. 1628, 1644, 14 L.Ed.2d 543 [1965] (Warren, C.J., with whom Douglas and Goldberg, JJ., joined, concurring). That purpose simply cannot be achieved if the jury's deliberations are tainted by bias or prejudice. Therefore, a defendant is entitled to a jury that will decide the charge according to the evidence presented in court and a jury that is free of outside influences. Sheppard v. Maxwell, 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L. Ed.2d 600, 613 [1966]. An impartial jury consists of nothing more than jurors who will

19

conscientiously apply the law and find the facts. <u>Lockhart v. McCree</u>, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 [1986].

According to research on jury verdicts intended to present a comprehensive review of the empirical research on jury decision making published between 1955 and 1999,

> The model of decision making endorsed (at least implicitly) by most courts is one in which jurors are assumed to pay complete attention, withhold judgment until all of the facts are in, discard any information that the judge so instructs, and carefully weigh a host of intangible factors. Several decades of research on human cognition suggest that this model rarely, if ever, holds in the real world. Instead, decisions are based on past experience in the form of scripts, schemas, stereotypes, and other cognitive mechanisms as well as personal beliefs and values about what is right, wrong, and fair. . . For instance, jury verdicts are influenced by the exposure of their jurors to pretrial publicity and inadmissible evidence (e.g., Caretta & Moreland, 1983 ; R. W. Davis, 1986 ; Kerr et al., 1999 ; Kramer et al., 1990 ; Padawer-Singer & Barton, 1975 ; Thompson et al., 1981 ), and defendants with prior felony convictions are more likely to be found guilty ( Blanck, 1985 ; Borgida & Park, 1988 ; Hans & Doob, 1976 ) or sentenced to death ( Baldus et al., 1983 ; Barnett, 1985 ). *Jurors also do not keep things separate as they are expected to . . .*

*Jury Decision Making*: 45 Years of Empirical Research on Deliberating Groups, Psychology, Public Policy, and Law March 2000 Vol. 7, No. 3, 622-727. The research was based upon 206 distinguishable studies involving deliberating juries (actual or mock) were located and grouped into 4 categories on the basis of their focal variables: (a) procedural characteristics, (b) participant characteristics, © case characteristics, and (d) deliberation characteristics. Id.

In the Defendant's case, one or more members of the jury utilized information by way of their private internet or other search of James Rosemond, and found prejudicial material, and shared this material with the rest of the jury and used this information as their basis for the conviction of James Rosemond. Such conduct is beyond the bounds of acceptable juror practice, as jurors are not permitted to conduct Internet searches to aid in deliberations. See <u>United States</u>

v. Bristol-Martir, 570 F.3d 29 [1st Cir. 2009]. There can be little doubt that such information was at least considered by jurors, given the above study results. As the jury was likely swayed by evidence from outside of the record, the Defendant submits that his rights to a fair trial and due process of law have been violated.

As the Defendant's constitutional rights were violated when he was tried by a partial jury, the Defendant submits that his conviction must be vacated in accord with the findings of this Court and the constitutional principles of fair play and substantial justice.


III.    **Trial Counsel Provided Ineffective Assistance in Permitting the Prosecution to Introduce Evidence of the Defendant's Statements Made During Confidential Proffer Sessions.**

The Sixth Amendment to the United States Constitution states that, in all criminal prosecutions, the accused "shall have the assistance of counsel for his defense." U.S. Const., Amend. VI. "The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and the legitimacy, of our adversary process." Kimmelman v. Morrison, 477 U.S. 365, 374, 106 S.Ct. 2574, 2582 [1986]. Further, the Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449 [1970]. The right to effective assistance of counsel at any critical stage encompasses the right to have an advocate for one's cause. Avery v. Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 322, [1940]. Counsel must "subject the prosecution's case to meaningful adversarial testing." United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 2947 [1984].

The Supreme Court established the test for determining whether a defendant has received the effective assistance of counsel in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2055

[1984]; see also United States v. Gordon, 156 F.3d 376 [2d Cir. 1998]; Sarroca v. United States, 250 F.3d 785 [2d Cir. 2001]; Aeid v. Bennett, 296 F.3d 58 [2d Cir. 2002]. The High Court stated that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. The Strickland test has two components, both of which must be satisfied to establish that defense counsel's performance was ineffective. First, "the defendant must show that the counsel's performance was deficient." Id. at 687. Second, the defendant must show that the deficient performance prejudiced the defense. Id.; Guerrero v. United States, 186 F.3d 275 [2d Cir. 1999] (successful ineffectiveness claim required showing that outcome would have been different).

"It is the client's right to expect that his lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of the client and in undertaking representation of the client's interests." Frazer v. United States, 18 F.3d 778, 785 [9th Cir.1994]. "Defense counsel must do his utmost to bring his legal acumen to bear on behalf of the defendant; keep the defendant fully informed of developments in the case and consult with the defendant on all major decisions to be made; conduct a reasonable pre-trial investigation, which should include contacting potential witnesses; prepare adequately and professionally for trial; conduct the trial to the best of his ability; and, at the bottom, serve as a vigorous and devoted advocate of the defendant's cause." United States Ex. Rel. Partee v. Lane, 926 F.2d 694, 702 [7th Cir. 1991].

In the instant case, defense counsel opened the door to the admission of damaging statements made by the Defendant during confidential proffer sessions by referencing the

22

sessions during opening statements. (Trial Transcript p. 50). "The rule of 'opening the door,' . . . gives the trial court discretion to permit a party to introduce otherwise inadmissible evidence on an issue . . . when it is needed to rebut a false impression that may have resulted from the opposing party's evidence." United States v. Rosa, 11 F.3d 315, 335 [2d Cir. 1993]. Statements made during opening arguments will serve to open the door. United States v. Carter, 801 F.2d 78 (2d Cir. 1986). See: United States v. Iorizzo, 786 F2d 57, 57 [2nd Cir. 1986].

In Bucklew v. Luebbers, 436 F.3d 1010 [8th Cir. 2006], the defendant argued that his counsel was ineffective for opening the door to evidence of prior bad acts. The trial court initially had granted a motion *in limine* to prevent the prosecutor from referencing the prior bad acts. Id. The defendant's counsel then referenced the incident in opening statements to demonstrate that the defendant's emotional state. Id. This reference opened the door for the prosecutor to admit all of the attendant circumstances of the prior bad acts. Id. However, counsel's conduct was not found to rise to the level of ineffective assistance, as the prior bad act evidence was ultimately admissible. Id.

In the Defendant's case, the evidence from the proffer sessions was inadmissible. See 18 U.S.C. § 6002; Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 [1973]. Despite this fact, counsel opened the door to admission of the proffer evidence by raising the proffer during opening statements. Similarly to Bucklew, the cause of raising such evidence was to demonstrate the emotional factors leading to decisions of actors in the case. However, herein, no such explanation was necessary, as defense counsel was merely putting forth why criminal defendants would cooperate with law enforcement officials. The desire to obtain lesser sentence is well understood by jurors absent reference to the Defendant's proffer sessions. In putting

23

forth that the Defendant was engaged in proffer sessions, defense counsel allowed the jury to

infer that the Defendant had engaged in and had knowledge of criminal wrong doing.

As the Defendant's constitutional rights were violated when he received ineffective

assistance of counsel, the Defendant submits that his conviction must be vacated in accord with

the findings of this Court and the constitutional principles of fair play and substantial justice.

**IV.     The Defendant's Right to Be Tried by an Impartial Jury Was Denied When the Trial Court Failed to Dismiss a Juror Who Was Clearly Biased in Favor of the Prosecution.**

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be deprived of life, liberty, or property, without due process of law." U.S. Const., Amend. V. In evaluating due process claims, this court inquires whether the practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). As stated by Justice Frankfurter, due process embodies a system of rights based on moral principles so deeply imbedded in the traditions and feelings of our people as to be deemed fundamental to a civilized society as conceived by our whole history. Due process is that which comports with the deepest notions of what is fair and right and just.

Solesbee v. Balkcom, 339 U.S. 9, 16, 70 S. Ct. 457, 461, 94 L. Ed. 604 [1950].

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the

right to trial by an impartial jury. The right to a trial by an impartial jury lies at the very heart of

due process. Irvin v. Dowd, 366 U.S. 717, 721-722, 81 S.Ct. 1639, 1641-1642, 6 L.Ed.2d 751

[1961]. "[O]ur common-law heritage, our Constitution, and our experience in applying that

Constitution have committed us irrevocably to the position that the criminal trial has one well-

defined purpose--to provide a fair and reliable determination of guilt." Estes v. Texas, 381 U.S.

532, 565, 85 S.Ct. 1628, 1644, 14 L.Ed.2d 543 [1965] (Warren, C.J., with whom Douglas and

Goldberg, JJ., joined, concurring). That purpose simply cannot be achieved if the jury's

deliberations are tainted by bias or prejudice. Therefore, a defendant is entitled to a jury that will decide the charge according to the evidence presented in court and a jury that is free of outside influences. Sheppard v. Maxwell, 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L. Ed.2d 600, 613 [1966]. An impartial jury consists of nothing more than jurors who will conscientiously apply the law and find the facts. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 [1986]. Impaneling a jury requires a trial judge to assess carefully the demeanor and tone of prospective jurors to determine if there is any potential for prejudice. United States v. Perez, 387 F.3d 201 [2d Cir. 2004]. District courts, of necessity, have both broad discretion and a duty to ensure that the jury ultimately impaneled is unbiased. Id. In certain circumstances, a court is obliged to dismiss a juror for bias. Id. If, for example, a juror affirmatively stated during voir dire that he was unable to act impartially, or if the juror was a close relative of a party, the juror must be dismissed. See, e.g., United States v. Haynes, 398 F.2d 980, 983-84 [2d Cir. 1968]. Beyond the categories of compulsory dismissal, district courts retain discretion to dismiss a juror whose voir dire answers evince a sufficient risk of partiality, but not so great that the presumption of bias is mandatory. United States v. Torres, 128 F.3d 38, 46-47 [2d Cir. 1997]. In the instant case, during a break in jury selection, juror number 12 spoke to the prosecution. (Trial Transcript p. 4). Juror number 12 was unable to recall the reason for speaking with the prosecution, a tale that seems unlikely. (Trial Transcript pps. 4-5). Juror number 12 also gave the prosecution a "thumbs up' sign. (Trial Transcript p. 5). Shargel moved the court to dismiss juror number 12 which motion was denied. (Trial Transcript pps. 8-10) The Court found that the juror's tale that she could not recall the cause for speaking with the prosecution was believable, as the juror was nervous upon being questioned by the Court. (Trial Transcript p. 10).

The Defendant submits that the Court's decision not to dismiss juror number 12 was erroneous. Whether the juror was nervous in answering the Court's inquiry is irrelevant. What is relevant is that the juror spoke to the prosecution, about a matter that was never revealed to the court. Such clearly presented a risk of partiality. Even if the conversation between the juror and the prosecution was innocuous, it was improper and the thumbs up sign was evidence of that jurors prejudging and partiality. As such, juror number 12 should have been dismissed. The failure to dismiss the biased juror resulted in the Defendant being tried by a partial jury, rendering the Defendant's conviction in violation of the Fifth and Sixth Amendments to the United States Constitution.

As the Defendant's constitutional rights were violated when he was tried by a partial jury, the Defendant submits that his conviction must be vacated in accord with the findings of this Court and the constitutional principles of fair play and substantial justice.

V.      **The testimony of Ross Kramer and Shargel could have impeached the testimony of the agents who testified of the purported admissions during the defendant's proffer sessions. This failure to Impeach was Ineffective Assistance.**

Had Shargel and Ross Kramer been called to testify, their testimony could have impeached the testimony of the government agents who testified to the purported admissions made by defendant during proffer sessions. The failure to call Shargel and Ross Kramer as witnesses violated the defendants Sixth Amendment Rights to effective assistance of counsel. United States v. Kliti, 156 F.3d 150 [2nd Cir. 1998]

26

**VI.    The Acts of Shargel Which Allowed the Prosecution to Use the Defendants Admissions Made Under Proffer Agreements Caused the Violation of the Defendant's Fifth Amendment Right Against Self Incrimination**

The introduction, by the prosecution,  of the defendant's admissions as evidence against him at trial was the defendant's self incrimination. The Fifth Amendment protects the defendant from being the "deluded instrument of his own conviction". <u>Colombia v. Connecticut</u>, 367 U.S. 568, 581 *quoting* 2 W. Hawkins, Pleas of the Crown 595 [8[th] ed. 1824]. This resulting self incrimination was solely the result of the actions of Shargel which made any result other than conviction impossible.


**VII.    The use if information from the proffer sessions which information was provided pursuant to and as controlled by the proffer agreements violated the defendants rights under contract law. This because the defendant did not violate the terms and conditions of the proffer agreement which agreements were not ambiguous and were detrimentally relied upon by the defendant. Consequently, the indictment should be dismissed.**

With the signing of each proffer agreement, defendant James Rosemond and the prosecution placed each other in privity with each other. Privity is defined as a "mutual or successive relationship to the same right of property, or such an identification of interest of one person with another as to represent the same legal right. Black's Law Dictionary (5[th] Edition 1979). Such a state always exists between the parties to a contract. In addition, proffer agreements are the same as plea agreements and informal immunity agreements which are governed by contract law. See: <u>United States v. Anderson</u>, 970 F.2d. 602, 606 [9[th] Cir. 1992].

The law of contracts is long established and, as to the provisions referred to here, has not changed.  "...[Where the parties have agreed to conduct themselves in accordance with

the rights and duties expressed in a contract, a court should strive to give a fair and reasonable meaning to the language used." Abele Contracting v. New York City School Construction Authority, *supra, citing,* Aaron v. Gilman, 309 N.Y. 157, 163, 128 N.E.2d 284 *and* Sutton v. East River Savings Bank, 55 N.Y.2d 550, 555, 450 N.Y.S.2d 460, 435 N.E.2d 1075. "When interpreting contracts, we have repeatedly applied the 'familiar and eminently sensible proposition of law that, when parties set down their agreements in a clear, complete document, their writing should...be enforceable according to its terms." Vermont Teddy Bear Co. v. 538 Madison Realty Company, 1 N.Y.3d 470, 475, 775 N.Y.S.765 [2004], *citing,* WWW Associates v. Giancontieri, 77 N.Y.2d 157, 565 N.Y.S.2d 440; *see* Reiss v. Financial Performance Corp., 97 N.Y.2d 195, 198 [2001] "...a court is not free to alter the contract to reflect its personal notions of fairness and equity." Greenfield v. Phillies Records, 98 N.Y.2d 562, 570 [2002]. And, "...in the event of doubt or ambiguity as to the meaning of the terms of the contract, the language must be construed most strongly against the party who prepared it."22 NYJur2 Contracts § 228, Davis v. Davis, 193 A.D.2d 1083, 600 N.Y.S.2d 669 [4th Dept 1993]. 4 Williston on Contracts, 3rd Edition § 621.

The appropriate remedy for a breach of the proffer agreement is the dismissal of the indictment. United States v. Plummer, 941 F.2d. 799, 803 [9th Cir. 1991].


**VIII.    Trial Counsel Provided Ineffective Assistance in Failing to Object to the Introduction of Irrelevant Evidence and in Opening the Door to Testimony That Made Such Evidence Appear Relevant.**

The Sixth Amendment to the United States Constitution states that, in all criminal prosecutions, the accused "shall have the assistance of counsel for his defense."

28

U.S. Const., Amend. VI. "The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and the legitimacy, of our adversary process." Kimmelman v. Morrison, 477 U.S. 365, 374, 106 S.Ct. 2574, 2582 [1986]. Further, the Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449 [1970]. The right to effective assistance of counsel at any critical stage encompasses the right to have an advocate for one's cause. Avery v. Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 322, [1940]. Counsel must "subject the prosecution's case to meaningful adversarial testing." United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 2947 [1984].

The Supreme Court established the test for determining whether a defendant has received the effective assistance of counsel in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2055 (1984); see also United States v. Gordon, 156 F.3d 376 (2d Cir. 1998); Sarroca v. United States, 250 F.3d 785 (2d Cir. 2001); Acid v. Bennett, 296 F.3d 58 (2d Cir. 2002). The High Court stated that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. The Strickland test has two components, both of which must be satisfied to establish that defense counsel's performance was ineffective. First, "the defendant must show that the counsel's performance was deficient." Id. at 687. Second, the defendant must show that the deficient performance prejudiced the defense. Id.; Guerrero v. United States, 186 F.3d 275 (2d Cir. 1999) (successful ineffectiveness claim required showing that outcome would have been different).

"It is the client's right to expect that his lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of the client and in undertaking representation of the client's interests." Frazer v. United States, 18 F.3d 778, 785 (9th Cir.1994). "Defense counsel must do his utmost to bring his legal acumen to bear on behalf of the defendant; keep the defendant fully informed of developments in the case and consult with the defendant on all major decisions to be made; conduct a reasonable pre-trial investigation, which should include contacting potential witnesses; prepare adequately and professionally for trial; conduct the trial to the best of his ability; and, at the bottom, serve as a vigorous and devoted advocate of the defendant's cause." United States Ex. Rel. Partee v. Lane, 926 F.2d 694, 702 (7th Cir. 1991).

In the instant matter, defense counsel failed to object to the introduction of irrelevant evidence. In order for evidence to be admissible, it must pass the threshold test of relevancy. Federal Rule of Evidence 401 states:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.

Evidence that is relevant is admissible under this rule but there are limits. Introduction of relevant evidence can be limited by the court for a "valid reason," and those valid reasons are set forth in Rule 403. Montana v. Egelhoff, 518 U.S. 37 [1996].

Federal Rule of Evidence 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

If the prejudicial value of the relevant evidence outweighs the probative value, then the evidence is excluded. See Old Chief v. United States, 519 U.S. 172 [1997]; United States v. Figueroa, 618 F.2d 934 [2d Cir. 1980].

Rule 403 focuses on the danger of unfair prejudice and gives the court discretion to exclude evidence only if the danger "substantially outweighs" the evidence's probative value. The Advisory Committee Notes to Rule 403 state that "unfair prejudice" means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one. As noted, defense counsel failed to object to the introduction of irrelevant evidence, specifically evidence obtained from a traffic stop against the Defendant's brother, Mario Rosemond. (Trial Transcript p. 973). Inside Rosemond's vehicle, police found a duffel bag containing a large amount of currency, and a trap compartment. (Trial Transcript pps. 976-

977). Although interesting, at no point during the introduction of this evidence was the evidence linked in any manner to the Defendant, rendering said evidence irrelevant. Only upon counsel opening the door for an apparent linkage of Rosemond's actions to the Defendant was the appearance of relevance gained. Upon cross-examination of a witness who falsified documents, defense counsel broadened the scope of said witness's testimony by inquiring as to the group of people for whom documents were falsified. (Trial Transcript p. 1094). Such allowed the government to inquire into the fact that documents were falsified for the Defendant and his brother, a fact that the government did no elicit during direct testimony. (Trial Transcript p. 1094).

In Wilson v. Mazzuca, 570 F.3d 490 [2d Cir. 2009], the defendant argued that his attorney was ineffective for eliciting testimony from a witness that opened the door to identification evidence against a defendant accused of various crimes, which in turn allowed the jury to learn that the Defendant already had a "mug shot." This evidence was unduly prejudicial to the defense because it immeasurably undermined the Defendant's mistaken identification defense, corroborated the eyewitness identification, and implied that the Defendant had a propensity for criminality and violence. Id. Accordingly, counsel was ruled to have provided ineffective assistance. Id.

Similarly, in the instant matter, defense counsel's actions opened the door for introduction of evidence appearing to link the Defendant to criminality, in the form of Mario Rosemond's wrong doing. Such clearly rendered counsel's performance below any objective standard of reasonableness. Counsel admitted that he did not intend to open the door for a broader questioning of the document forging witness. (Trial Transcript, p. 1094). The

31

Defendant was prejudiced by counsel's actions, in that the Defendant was painted with the brush of being associated with criminals, thereby being labeled guilty by association.  As such, counsel's assistance was ineffective. See: United States v. Iorizzo, 786 F2d 57, 57 [2nd Cir. 1986].

As the Defendant's constitutional rights were violated when he received ineffective assistance of counsel, the Defendant submits that his conviction must be vacated in accord with the findings of this Court and the constitutional principles of fair play and substantial justice.


IX.     **It was error for the court to permit the prosecution to elicit testimony from a federal agent  which testimony was that the defense attorney had provided to the prosecution those eight (8) names of those the defense attorney represented to be drug suppliers of the defendant.**

When the court permitted this it was error as it constitutes the elimination of the attorney client privilege. See: United States v. Wiseman, 274 F.3d 1235 [9th Cir. 2001].



**CONCLUSION**

For the above stated reasons, the Defendant prays that his Motion for a New Trial is granted. The issues here are conflict of interest, ineffective assistance of counsel, juror misconduct, prosecutorial impropriety and judicial error.

Here, because of the conflict of interest, the Strickland analysis must follow this court's analysis of that presented under Cuyler v. Sullivan, 446 U.S. 335, 64 L.Ed2d 333, 100 S.Ct. 1708 [1980]. Under this standard the defendant need only show that there was an actual conflict that adversely affected Shargel's representation of him. Prejudice, under this analysis, need not be

shown. Thereafter, if necessary, a <u>Strickland</u> analysis for ineffective assistance of counsel would follow.

""""Under <u>Strickland</u>, in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two-pronged test: (1) he 'must show that counsel's performance was deficient,' so deficient that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance'; and (2) he must show 'that the deficient performance prejudiced the defense,' in the sense that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."" <u>United States v. Frederick</u>, 868 F.Supp.2d 32, 45 [E.D.N.Y.] *quoting* <u>Bennett v. United States</u>, 663 F3d 71, 84 [2nd Cir. 2011] *citations omitted* (quoting <u>Strickland</u>, 466 U.S. at 687, 60, 694, 104 S.Ct. 2052). So, what the defendant must overcome is the presumption the challenged actions of his counsel's performance might have been considered sound trial strategy. <u>Id</u>. And that must be evaluated fro the perspective of his trial counsel at the time of the attacked acts and/or omissions in light of all relevant circumstances. <u>Id</u>. *citing* <u>Raysor v. United States</u>, 647 F.3d 491, 495 [2nd Cir. 2011] *quoting* <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 [1986]. Here we have the defense attorney, among other things, acting as a private attorney general for the prosecution when he provided the prosecution with eight names that he identified as the persons who were the cocaine suppliers to the defendant's purported criminal enterprise and, thereafter, failing to remove himself and his associate as defense counsel when knowingly in violation of DR 5-102. Then both acts were followed by the defense committing acts that removed all expectation of confidence from the defendant's understanding and belief and that, along with providing the eights names, assured the conviction of the

33

defendant. These issues mandate that the defendant be given a new trial as do the issues

presented that come under  Cuyler v. Sullivan, 446 U.S. 335, 64 L.Ed.2d 333, 100 S.Ct. 1708,

[1980] and other cases cited herein.

Because the defendant's attorney was conflicted, placed himself before his client's best

interest, because he was a constructive prosecution witness in that he provided evidence to the

prosecution that was used to convict the defendant and then permitted the prosecution to enter

into evidence that said damning evidence - on this evidence the court erred in permitting in that

it wqas supplied by the defendant's attorney - as well as the fact that it came from him could

have no other effect on a juror, especially when considering its corroborating effect, but to result

in a guilty verdict. And equally damning to the defendant is that his attorney, Shargel, committed

acts which knowingly allowed the prosecution to put into evidence the admissions made by

defendant James Rosemond during proffer sessions could have no other effect that the

conviction of James Rosemond. This the prosecution cannot deny for a read through the

prosecution's summation and rebuttal summation shows that the prosecution again, and again

and again said to the jury that it had to convict defendant James Rosemond because of nothing

else but his admissions. Add to the above the juror misconduct, the errors and all else that

severely prejudiced defendant James Rosemond such as the refusal of Shargel to follow the

instructions of the defendant and the failure of Shargel to call important witnesses with actual

knowledge of the defendant's businesses and who Shargel assured the defendant he would call, a

new trial should be granted. In addition, with all else herein, the prosecution breached the

contractual proffer agreements that it entered into with the defendant. All were violated when the

prosecution introduced the purported admissions made by the defendant. In addition, because the

defense attorney threw away the opportunity to impeach the testimony of the government agents by calling himself and his associate as witnesses all also, with all else raised herein, mandate that the defendant be given a new trial.

In regard to the prosecution's breach of the proffer agreement contract, that it entered into with the defendant, it had made an arms length agreement with the defendant under the very same standards that govern all like agreement including plea and cooperation agreements. The breach was improper and it was by the prosecution when it used the admissions made by the defendant, during those proffer sessions, mandates the dismissal of the indictment. Its proffer agreement was binding and all ambiguities therein are legally required to an adverse inference against the drafter who was the prosecution. The defendant had every reason to believe that he could rely on the sanctity of that agreement. But, at trial, he learned that his reliance was detrimental because the prosecution knowingly and intentionally did not honor that contract.

There is the issue of juror misconduct. Here, there is an interview of juror Olatunji who tells of two (2) of the women who were jurors who told him that they relied on information that they had on Tupac. That information was not, at all, a part of this trial. And, Olatunji's report to the interviewer is corroborated by Tamika Wooley's experience, which is set forth in her affidavit, of the discussion that she heard of two (2) of the women who had been among the defendant's jurors, one of whom was the foreperson of the jury. She overheard them, immediately after the trial, complaining to each other about the male juror who did not see it their way. While the prosecution may argue otherwise, that it involved two (2) women jurors and one (1) male juror is significant enough to bring the jurors back to the courthouse, without

35

advising them of the reason for their return, and then to interview each on while the others are sequestered.

The permitting of the prosecution to introduce evidence of the defense attorney providing it with evidence improperly bolstered the prosecutions case and that along with the constructive prosecution witness status of Shargel had to make the jury believe that EVEN THE DEFENSE ATTORNEY IS SAYING THAT THE DEFENDANT IS GUILTY. The amount of prejudice was so great that it is immeasurable. Here, there was no fair trial!

In light of all presented, this court should seriously consider vacating the verdict and dismissing the indictment. And, if not that, at minimum the court should grant the defendant a new trial.


Dated: July 11, 2013


                                              Respectfully submitted.

                                              /s/
                                              David A. Bythewood, Esq. (DB-2814)
                                              85 Willis Avenue, Suite J
                                              Mineola, New York 11501
                                              (516) 741-0066
                                              Dabytheesq@aol.com

To: U. S. Attorney, EDNY