UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA

                                      AFFIDAVIT

        -v-

                                      11 Cr 424 (JG)

JAMES ROSEMOND

                    Defendant
-----------------------------------------------------------x

State of New York, County of Nassau.....SS.:


I, James Rosemond, Jr., being duly sworn, depose and says:


      1. I am the son of the above named defendant and disclose that at the outset in order there to be complete transparency.

      2. There is a website known as "thesmokinggun.com" that writes articles about celebrities and people who are known and /or established in the entertainment industry.

      3. Almost a year prior to my father's trial it came to my attention that the website known as thesmokinggun.com had published an article on line in which it disclosed a Czar Entertainment employee named Tony Martin as one who would be a witness against for the prosecution and against my father at my father's trial.

      4. As of that time, Tony Martin had been employed by Czar Entertainment, by father's company, for approximately nine (9) years. So, I knew him and had his cell telephone number which I had preserved on my cell phone.

5. Within a day or so after thesmokinggun.com article on Tony Martin was published, I started receiving calls from Tony Martin's cell phone. These calls were numerous. But, because of the article on thesmokinggun.com I would not answer or take any of his calls.

6. From the time he was arrested, I visited with my father at MCC, when I could, and did so once I started to receive the calls from Tony Martin.

7. I told my father of the Tony Martin calls and discussed both Tony Martin trying to call me and the article on thesmokinggun.com about Tony Martin.

8. My dad told me to be careful of what I said if I took any of Tony Martin's calls.

9. After discussing it with my father, I took two (2) of Tony Martin's calls. The first was interrupted by bad cell service and, thereafter, Tony Martin called me back and we completed our conversation.

10. The sum and substance of the conversation with Tony Martin was that he told me that the only reason that he was going to testify against my Dad at trial was for reason that so long as he did so he would get probation. He also told me that the testimony he was going to give at my father's trial, pursuant to his plea agreement with the prosecutors, was about things that he had no knowledge of, and that he was sorry about it. He further said that his giving such testimony about things he knew nothing about was the only way he could get probation. He made this all very clear to me.

11. I recorded the conversations with Tony Martin, preserved them on a CD and turned that recording over to my Dad's new attorney, David A. Bythewood, Esq. In addition, I gave a duplicate CD of these Tony Martin conversations to my Dad's trial attorney, Gerald Shargel, so he could use these conversations to assist him in defending my Dad. He never used them. A

# AFFIDAVIT

COMES NOW Mark Samedi, pro se, and under penalty of perjury avers as follows:

1. My Name is Mark Samedi. I was born on May 14, 1973.

2. I am the individual named in case number 09CR1130-02 in the Southern District of New York.

3. I was arrested on August 25, 2009 pursuant to a criminal indictment for conspiracy to distribute cocaine and cocaine base (also known as "crack").

4. I was found guilty and sentenced to a mandatory minimum sentence of ten years.

5. If I was called as a witness I would testify that I am personally acquainted with the individual known as James Rosemond. He is my cousin on my mother's side of the family.

6. I would further testify that to the best of my knowledge James Rosemond was not part of my conspiracy and played no role in any of the predicate acts that lead to my arrest and conviction.

7. At no point during the review of the discovery materials related to my case was the name James Rosemond mentioned, nor was I questioned about him by anyone involved in the investigation or prosecution of my case.

8. To the best of my knowledge, James Rosemond had nothing to do with my case or those of my co-conspirators.

9. I have received nothing in exchange for this affidavit either from the government, James Rosemond or any third party. I give this testimony freely and of my own free will in the hope of seeing justice done.

I declare the above to be true and accurate under penalty of perjury. Done this __10__ day of July, 2013 at FPC-Loretto, Loretto, PA.

/S/ Mark Samedi
Mark Samedi
Inmate No. 70730-054

Commonwealth of Pennsylvania
County of ____Cambria____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Kenneth Hite, Notary Public
Allegheny Twp., Cambria County
My Commission Expires March 17, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Sworn to and subscribed before me this __10__ day of __July__, 20_13_.

AFFIDAVIT OF JAMES ROSEMOND
IN SUPPORT OF MOTION FOR NEW TRIAL

I, James Rosemond, hereby swear under the penalty of perjury the the following is true to the best of my knowledge.

1. Defendant is incarcerated at the Metropolitan Correctional Center at 150 Park Row, New York, New York.

2. Defendant was convicted on June 5, 2012 via jury trial of Continuing Criminal Enterprise and other lesser charges of Conspiracy to distribute, firearms, obstruction of justice and financial crimes.

3. Defendant was arrested on June 21, 2011, however two years before defendant's arrest it was well known the that the U.S Attorney office had an investigation and defendant hired Jeffrey Lichtman as his attorney to inquire about said investigation.

4. All of the witnesses the government were interviewing told defendant's attorney Jefferey Lichtman the prosecutor Todd Kaminsky were being suggestive to them to implicate defendant in crimes.

5. All of the testifying witnesses knew in this case knew Todd Kaminsky name because they either heard from some of the witnesses that were interviewed or I openly told them.

6. Defendant was not surprised in December, 2010 when Khalil Abdullah (a cooperating witness) directed a letter to Todd Kaminsky telling him money in a studio belong to the defendant in an attempt to take the investigation off of himself.

7. DEA agents tried unsuccessfully to arrest defendant on May 11, 2011.

8. Defendant put out a press release thereafter exposing government cooperators and defendant wrote some derogatory things about both Todd Kaminsky and his supervisor Carolyn Pokorney. This statement appeared in various publication including online website.

9. Upon defendants arrest on June 21, 2011, the arresting DEA agents delayed taking the defendant to arraignment so a news photograph could arrive to capture photos of defendant being escorted by agents handcuffed.

10. When defendant asked agent Steven Miller why they were doing that he replied, "you should have never release the statement against Todd Kaminsky and Carolyn Pokorney.

11. After arraignment the government move to disqualify Jeffrey Lichtman through Curcio letter and hearing. Court gave defendant time to retain new counsel.

JAMES ROSEMOND    AFFIDAVIT - PAGE TWO

12. Late September 2011, defendant hired Gerald Shargel as new attorney and he immediately call the government in search of a resolution.

13. Government explained to Mr. Shargel that they wanted defendant to cooperate against entertainers mainly Wyclef Jean, Sean Combs, Reverend Al Sharpton, among other celebrities that included entertainers with crime of violence. Prosecutors Todd Kaminsky and Carolyn Pokorney admonished Mr. Shargel that the defendant needed to hurry as he missed out on Lamont Bennet and defendant can assist with information on Roger Rosen an attorney they were investigating.

14. Defendant explained to Mr. Shargel that he had no information on entertainers or celebrities but told Mr. Shargel confidentially of eight names of individual he knew sold cocaine in Los Angeles.

15. Defendant continuously told Mr. Shargel that he did not trust the particular prosecutors because of the prior events and their aggressive investigation, newspaper leaks with cooperators putting me in crime of violence.

16. Defendant indictment was taped on the door of his residents including those rented to tenants for all to see and those willing to help the defendant was visited and asked why they were willing to help defendant in a posture of discouraging any support defendant may have had.

17. Cooperating witness Tony Martin kept calling the defendant son after an article was posted on various websites and defendant son recorded this conversation which contained exculpatory statements which defendant directed him to give to Mr. Shargel to use at trial to impeach Tony Martin however, Mr. Shargel never played the tape for the defendant nor did he use to impeach Tony Martin at trial. (See affidavit from James Rosemond jr. and transcript of Tony Martin attached thereto.)

On October 11, 2011, defendant reluctantly went to a proffer with the government with the same arresting agents and prosecutors that defendant mentioned above and after the third proffer session defendant told Mr. Shargel that he didn't trust or feel comfortable as the agents and prosecutors kept asking the defendant about crime of violence the defendant knew nothing about. When the defendant said he didn't know about a certain event they asked they accused the defendant of lying. At one point the prosecutors started leading their questions trying to get defendant to confess to things he knew nothing about. (e.g., they ask defendant about a murder where a man was gutted and kept asking the defendant about it because others told them defendant did that.)

19. Proffers became more awkward with defendant when prosecutor Todd Kaminsky asked the defendant in a room full of agent

2

JAMES ROSEMOND - AFFIDAVIT - PAGE THREE

about woman and start showing naked pictures of different woman to the defendant. Questions became even more bizzare when said prosecutor asked about entertainers sexual preferences, including but not only, Sean Combs having sexual relationships with under age boys.

20. Proffers became coercive for defendant as said prosecutor and agents would say, "if you give us a murder look at it as a point system and the murder being the most points you can get any other crime are lesser points for us to argue in front of the judge for you to get a time reduction. And maybe you will go home."

21. Defendant protested to Mr. Shargel who told defendant to "keep talking". Mr. Shargel did not object at any time or advise defendant how to deal with this, at which point defendant began fabricating stories the prosecutors wanted to hear including the story of Roger Rosen and others.

22. Defendant believed these are the things that Ross Kramer and/or Shargel would testify to if needed to testify.

23. Out of nine (9) proffers with the government Shargel attended all the sessions and Mr. Kramer was present at six (6) or seven (7) of them.

24. Approximately March 2012, counsel informed defendant he would not be receiving a cooperation agreement.

25. Defendant told Mr. Shargel as before he never believe these prosecutors would give him a deal.

26. Counsel related to the defendant that the government offer was 30 years to life. Defendant would argue for 30 years and government life. Defendant at that time figured he would proceed to trial.

27. On April 4, 2012 or thereafter Mr. Shargel brought defendant two (2) cases to explain what challenges at trial to expect. Those cases were: U.S v. BARROW, 400 F.3d 109 (2nd cir. 2005) and U.S v. OLUWANISOLA, 605 F.3d 124 (2nd cir. 2010) (cover of cases with Mr. Shargel name and date attached as exhibit 1A & 1B)

28. Defendant was told by counsel to carefully read government's letter dated April 9, 2012, which Mr. Shargel and Mr. Kramer found to be littered with falsities that were profound in material nature. Discrepancies were numerous but in counsel letter dated April 11, 2012, to the courts Mr. Shargel only listed six distinctive issues that was obvious that the government intended to fill in the blanks so defendant could not defend himself at trial. (See government letter dater April 9, 2012 and Mr. Shargel letter dated April 11, 2012)

3

JAMES ROSEMOND - AFFIDAVIT - PAGE FOUR

29. On April 12, 2012, a Curcio hearing was summoned but no waiver was obtained, because defendant needed his attorney to be his witness just in case the government introduced the disputed issues listed in counsel's letter dated April 11, 2012. However, if defendant was told by the court that defendant would waive going to trial with conflict burden attorney he would have not waived that right regardless.

30.

30. In preparation of trial under the Barrow and Oluwanisola, Id., Mr. Shargel told defendant that there were too many lies in the proffer statements that the government wrote that he would have to "dodge rain drops" and wanted to open the door to the proffers - allowing Ross Kramer to refute vehemently the proffer statements that weren't true and explain to the jury the coercive nature of the sessions

31. Defendant explained to Mr. Shargel he would would **"only agree to this unusual strategy"** only if counsel was sure that Ross Kramer would explain explicitly what happen at the proffer sessions and its coercive nature.

32. At trial Mr. Shargel promised to call several witnesses outside of Ross Kramer including Mark Samuel, accountant Arty Erk, Attorney Jay Quartrini, road manager Jeff Christie and inmate Mark Samedi.

33. Defendant counsel agreed that these witnesses were crucial to defendant's defense to contradict government case in chief.

34. Counsel got in touch with most of these witnesses and advise them not to come to the court house because they would be called as witnesses.

35. Mr. Shargel gave no indication to the defendant, courts or the government in open court that he wasn't calling Ross Kramer as a witness for the defense. Infact throughout the trial counsel invoked Mr. Kramer name saying he would testify to certain elements about the proffers.

36. Defendant emailed Mr. Shargel on May 28, 2012 complaining that he was not fully cross-examining the government witness (see email dated May 28, 2012 attached)

37. After the government rested its case Mr. Shargel on May 30, 2012 informed the defendant that he would not call Mr. Kramer as a witness eventhough he open the door to the proffer statements. Defendant told him that it was unacceptable and wanted Mr. Kramer to testify and wrote an email when defendant returned to the facility reiterating the same. (see email dated May 30, 2012)

38. Defendant fiance advised the defendant that night also that Mr. Shargel didn't contact any of the other witnesses listed above and they were concerned because they were not prepped for trial.

4

## JAMES ROSEMOND - AFFIDAVIT - PAGE FIVE

39. On May 31, 2012, defendant related to Mr. Shargel that he wanted to testify on his own behalf to explain why he went into the proffer sessions and what actually happen in them since Mr. Kramer wasn't going to testify for the defendant and counsel responded bluntly, **"don't even think about it."**

40. By Shargel's action alone, even without anything else-whether true or not-inflamed the minds of the jury enough to convict the defendant by cousel introduction of the proffers. What Shargel did was devastating.

41. It is the defendant belief that Mr. Shargel had no real interest in zealously representing defendant but concern and interest was the amount of money he could make from defendant.

42. Defendant believed that all that occurred during the proffer sessions were protected and confidential, and that unless I violated the proffer contract all would remain protected. Had this contract not been breached by the prosecution, the issue of what was actually said-during those sessions-would have never been an issue. However, at trial, that was not the case for the prosecution breached the proffer agreements and, to make things worse, presented material misrepresentations of what I purportedly said to them.

43. Defendant never breached contract, the actions of counsel were what the prosecution used as a purported excuse to violate the proffer contracts. Even with Shargel's improprieties, this shouldn't have occurred, those contracts were with the defendant not Mr. Shargel.

44. Mr. Shargel and his associate Mr. Kramer both knew of the material misrepresentation by the agent of what defendant said in proffers and were the only witnesses who could give testimony to those facts but neither testified to those misrepresentations in front of the jury. They could have impeach those making those material misrepresentations.

45. Furthermore, Mr. Shargel and the courts allowed testimony of eight (8) suppliers that counsel purportedly received from defendant without objection or requesting a mistrial.

46. Mr. Shargel also allowed the court to charge the jury or never requesting a special jury charge (or objecting) to convictions to both the CCE and Conspiracy. (**Rutledge v. U.S.**, 517 U.S. 292)

47. At no time did Mr. Shargel explain to defendant a reason why he didn't call Mr. Kramer as he represented at the Curcio hearing and during trial. He also represented this to the courts and the government during the trial.

48. Nor did the defendant hear the court request from counsel an explanation for not calling Mr. Kramer after counsel represented he would; notwithstanding, him to forgo inquiry

<u>JAMES ROSEMOND - AFFIDAVIT - PAGE SIX</u>

48. of agents about their testimony of fallacious proffer statements that were coercive and details of the duress that they were made under. Defendant believe that if Mr. Shargel wasn't burden with conflict he would have been able to elicit those things. (See discourse between court and Mr. Shargel, trial transcript 1458-59 and 1467-72; compare **U.S v. Iorizzo**, 786 F.2d 52,58)

49. During the trial defendant's counsel ask defendant for twenty thousand dollars to writ Mark Samedi from his facility in Kentucky to testify on behalf of the defendant but never made such request.

50. Mark Samedi was arrested with Malik Akbar on August 25, 2009 in the Southern District of New York and took a plea to 21 USC 846 in 2010 before defendant was arrested. Mark Samedi was willing to testify that those drugs that he pleaded to was not related to the defendant, that he, Malik Akbar and Khalil Abdullah acted alone without the defendant knowledge. Those charges appear on the defendant indictment as count four (4) and the violation of count one (1) violations 3, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18. This would have attacked and challenge the government case in chief. (See Mark Samedi affidavit attached thereto.)

51. After all of the above-mentioned the defendant was convicted forthwith by jury of all counts charged.

52. On March 20, 2013 the defendant filed a **FARETTA** motion to disqualify Mr. Shargel for ineffective assistance of counsel and proceed pro-se. (**FARETTA v. CALIFORNIA**, 422 U.S. 806 (1975))

I declared under the penalty of perjury that the foregoing is true and correct to the best of my ability pursuant to 28 U.S.C §1746(2).

*[signature: James Rosemond]*

JAMES ROSEMOND
REG. NO. 17903054
MCC - NEW YORK
150 Park Row
New York, NY. 10007
August 23, 2013

SHARGEL GERALD 4/4/2012
For Educational Use Only

Exh. 1A

U.S. v. Oluwanisola, 605 F.3d 124 (2010)

605 F.3d 124
United States Court of Appeals,
Second Circuit.

UNITED STATES of America, Appellee,
v.
Olawale Lateef OLUWANISOLA,
Defendant–Appellant.

Docket No. 08–4442–cr. | Submitted:
May 29, 2009. | Decided: May 21, 2010.

**Synopsis**

**Background:** Defendant was convicted, in the United States District Court for the Eastern District of New York, of conspiracy to import heroin, conspiracy to possess with intent to distribute heroin, and possession with intent to distribute heroin. Defendant appealed.

**Holdings:** The Court of Appeals Pooler, Circuit Judge, held that:

[1] counsel's opening argument as to insufficiency of evidence and cross-examination of government witnesses would not trigger partial waiver of defendant's rights contained in proffer agreement;

[2] District Court's ruling that proposed opening argument and cross-examination would trigger waiver provision was not harmless error; and

[3] evidence was sufficient to support drug quantity determination.

Vacated and remanded.

West Headnotes (11)

[1] **Criminal Law**
⟵ Plea Negotiations and Offers to Plead Guilty

Because the rule of evidence barring admission of statements made by defendant during plea discussions constitutes an exception to the general rule that all relevant evidence is admissible, its limitations are not to be read broadly, and its protections are waivable. Fed.Rules Evid.Rule 410, 28 U.S.C.A.

[2] **Criminal Law**
⟵ Particular cases

Defense counsel's opening argument as to insufficiency of evidence and cross-examination of government witnesses as to credibility and to demonstrate insufficiency of government's proof would not trigger partial waiver of defendant's rights contained in proffer agreement, allowing government to use statements made during defendant's proffer sessions only "to rebut any evidence offered or elicited, or factual assertions made, by or on behalf of defendant," in prosecution for conspiracy to import heroin, and related heroin offenses; interpreting waiver provision to permit such result would leave defendant, for all practical purposes, defenseless, and such argument and questioning was permissible when defendant did not directly or indirectly contradict facts he admitted in his proffer. Fed.Rules Evid.Rule 410, 28 U.S.C.A.

2 Cases that cite this headnote

[3] **Criminal Law**
⟵ Prejudice to rights of party as ground of review

A constitutional error does not always require reversal of a criminal conviction.

[4] **Criminal Law**
⟵ Prejudice to rights of party as ground of review

**Criminal Law**
⟵ Conduct of Trial in General

While structural defects, which affect the framework within which the trial proceeds, are subject to automatic reversal, trial errors, which are relatively limited in scope, are subject to harmless error review.

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.    1

SHARGEL GERALD 4/4/2012
For Educational Use Only

Exh. 1 B

U.S. v. Barrow, 400 F.3d 109 (2005)
66 Fed. R. Evid. Serv. 734

400 F.3d 109
United States Court of Appeals,
Second Circuit.

UNITED STATES of America, Appellee,
v.
Leotha BARROW, also known as "Petey", Defendant,
Calvin Johnson, also known as "Kyle", Defendant–Appellant.

Docket No. 03–1074. | Argued: Sept. 14, 2004. | Decided: March 2, 2005.

**Synopsis**

**Background:** Following a jury trial, defendant was convicted in the United States District Court for the Eastern District of New York, Nicholas G. Garaufis, J., of multiple counts of distributing or possessing with intent to distribute, or conspiring to distribute or possess with intent to distribute cocaine base, cocaine, and heroin. Defendant appealed.

**Holdings:** The Court of Appeals, Raggi, Circuit Judge, held that:
[1] waiver provision of proffer agreement was triggered by defense counsel's opening statement and cross-examination of witness;
[2] proffer agreement waiver was not limited to direct contradictions of defense counsel's factual assertions;
[3] proffer statements made by defendant indicating that he had been a crack dealer were admissible to rebut defense counsel's factual assertions;
[4] omissions from defendant's proffer statements were admissible to rebut defense counsel's factual assertions; and
[5] district court's decision to allow detective to testify as both a fact and expert witness was not manifestly erroneous.

Affirmed.

West Headnotes (14)

[1] **Criminal Law**
 ⸺ Negotiations for Compromise

A proffer agreement is a contract that must be interpreted to give effect to the intent of the parties.

3 Cases that cite this headnote

[2] **Criminal Law**
 ⸺ Review De Novo

Court of Appeals would review de novo issue of whether proffer agreement waiver applied to defendant.

2 Cases that cite this headnote

[3] **Criminal Law**
 ⸺ Statements

Court of appeals would review for an abuse of discretion district court's evidentiary rulings admitting parts of defendant's proffer statements and would not reverse unless an error affected a substantial right. Fed.Rules Evid.Rule 103(a), 28 U.S.C.A.

1 Cases that cite this headnote

[4] **Criminal Law**
 ⸺ Reception and Admissibility of Evidence

An evidentiary error affects substantial rights only if it had a substantial and injurious effect or influence on the jury's verdict.

[5] **Contracts**
 ⸺ Language of contract

Where the language of a contract is unambiguous, the parties' intent is discerned from the four corners of their agreement.

3 Cases that cite this headnote

[6] **Criminal Law**
 ⸺ Estoppel or waiver

Defense counsel's assertions on opening statement that defendant was not the real perpetrator of the charged crimes, as well as

Transcript - Tony Martin

R, jr.   Hello, hello

TM   Yo

R, jr.   Yo Yo What up boy?

TM   What up an, you just tell my man I love him to death don't believe the hype brah.

R, jr.   Yeah, we were disappointed man, you know what I mean.

TM   Tell him, man, I love him to death donb't believe the hype brah, I don't know who put that out there, but tell him don't believe the htpe at all.

R, jr.   Yeah, I was, like, damn man, nt my Tony dog. That hurt my stomach.

TM   Yo nigga man, that shit, that shit, that shit, I don't cry for nothing man. I started fucking crying brah.

R, jr.   Oh.

TM   Listen man, I don't really know, I can'tt really talk to dude and I can't talk to you man, but tell that nigga man, don't believe the hype brah. I'm cool man. I m ight have took that man. I never knew the case brah–out. Tell dude don't believe the hype. That's all.

R, jr.   Alright, cool. I'll tell him. So, its not true at all huh?

TM   Not at all brah. Don't believe the hype man.

R, jr.   Alright man.

TM   Yo, I'm not going to front that shit, fuck my head up. I've been fucked up the last three days man.

R, jr.   Yeah man. We were upset too. Me and my father stomach was hurting like dag, Tony man. We knew you. He knew you for 9 years. He was hurt man. When I saw him on Wednesday he was hurt man.

TM   Huh?

R, jr.   I said, when I saw him on Wednesday he was hurt man. He was like, yeah, I knew Tony for 9 years.

TM   Listen man. That man changed my life brah. Tell that man do not believe the hype brah.

R, jr.   Yeah man, I'm glad you call - let us know its not true.

TM   Tell him, man, I took a deal, man, cause I wanted to just get probation. But, I told them wild shit. Man, tell him, brah, that he good on my side.

R, jr.   OK, I'll tell him.

TM   Heard me?

R, jr.   Yeah. I'll tell him when I see him on Wednesday. I'll let him know.

TM   Tell him we good.

R, jr.   Alright. Cool.

TM   Alright, I love y'all niggas. That nigga did too much for me man.

R, jr.   Alright man.

TM   Like I'm telling you, tell him he's a father to me. Man, he's good.

R, jr.   Alright. man. Appreciate it man.

TM   Alright man.

R, jr.   Alright, love.

TM   Alright, love. (Apparent loss of signal and disconnect. Then, Tony Martin calls back)

TM   I don't know who put that shit out there brah, but my head been fuck up for the last 4 days.

R, jr   Alright, I'll tell him, I'll let him know.

TM   I don't know who did it man but ... like when I tell you my head is fucked up brah. My head is fucked up like no tomorrow, man, like big time.

R, jr.   Yeah man, my head was messed up too man. I came out here to college. I was just thinking about that. Dog, cause it was everywhere online. So, you know.

TM   Yo, this shit is everywhere man. I'm like, who would like... My question is, honestly brah, I don';t know if he did that shit to me man.

R, jr.   Who?

TM  Dude, I was like, did he put that story out there thinking that it would be to make niggas not fuck with me.

R, jr.  Oh.

TM  My whole thing is that I didn't even do nothing...my whole thing is this there's nothing... my whole thing is this there's nothing to say. You know what I'm saying?

R, jr.  Yeah.

TM  So, for me to say something about him (Phone cuts out again and Tony Martin calls back)

R, jr.  Hello, hello

TM  heloo

R, jr.  Yeah

TM  I hung up by mistake. But, yeah, there's nothing, there is nothing to say on. Dude, like dude brought me around like you know what I mean. Yeah, never did that to me. You know what I'm saying? Dude never put me around like that. You know what I mean.

R, jr.  Yeah.

TM  So, me to say all that, its like I'm not gonna lie to make somebody feel good. But, there's like nothing ...the dude never di nothing around for me to say on him. You know what I'm saying?

R, jr.  Yeah. So, dog, what they made you lie?

TM  No, there is none. There is, there is there isn't nothing that's going on that's what I'm saying like, there is like, there is nothing for me to say to no one. There is nothing to say.

R, jr.  Yeah, I'll let him know. I'll let him know. I'm gonna let him know you reach out cause I'm out here in Boston for college. UMH...

TM  How was his mood when he heard that shit?

R, jr.  Man, he was hurt because he look at, you know, as his son, you know. I knew he told me this on Wednesday" I know Tony for 9 years. He was like, man... I can't believe he's gonna turn his back on me and lie. So, you know, he said he was, like man, he can't believe you lying, you know, to just get out of something you had nothing to do with. You know?

TM  Like, there is no reason for me to lie. There is no way I'm gonna lie on him brah. I have...

       I'm not gonna say that man made me, that man made me... But, I'm not gonna lie on that man to make myself look bigger brah. But, first of all, I didn't do that. But, at the same time, man, I'm not gonna lie on that man-dude. That man never did that to me brah. You know what I'm saying?

R, jr.    Yeah.

TM    Like, real talk brah. Like tell that nigga I love him. That's my father too man.

R, jr.    Yeah, I'll let him know though. I'll let him know.

TM    Yeah man, tell him, man, that's why I ain't know how to step to you because I didn't know if them people watching but, but I saw that shit on BBM today. I don't know if they watching man. Don't believe the hype brah.

R, jr.    Yeah, yeah.

TM    Tell that man, like, whenever you see me on BBM. Whatever you say man. But, no one can see that shit. Don't believe that hype brah. Real talk man. Like, even you brah. Love you to death man. Don't believe the hype.

R, jr.    Yeah, appreciate it brah.

TM    Man, I'm fucked up brah. Been fucked up for the last 4 days. Man, I mean fucked up.

R, jr.    That's crazy.

TM    Emotionally up. I'm emotional wreck. But, don't believe the hype though. Alright?

R, jr.    Yeah, definitely, definitely, definitely.

TM    And, I ain't know if you wanted to talk to me or not. Man, I just wanted you to see that. Ok?

R, jr.    Alright. Appreciate it man.

TM    Alright man.

R, jr.    Alright, Tony.

TM    And, tell him I love him man.

R, jr.    Ok, definitely.